**Thurman J. HALEY et al., Plaintiffs,**

v.

**Jerome P. TROY, Justice of the Municipal Court of the Dorchester District. Defendant.**

**Civ. A. No. 70–61.**

United States District Court,
D. Massachusetts.

Feb. 2, 1972.

Michael L. Altman, R. Peter Anderson, Boston Legal Assistance Project, Dorchester, Mass., for plaintiffs.

Walter H. Mayo, III, Charles K. Mone, Asst. Atty. Gens., Boston, Mass., for defendant.

## MEMORANDUM

FRANK J. MURRAY, District Judge.

This is a civil rights action brought by three persons, who receive public assistance under the public welfare laws of Massachusetts, seeking injunctive and declaratory relief against Jerome P. Troy, a justice of the Municipal Court of the Dorchester District. Jurisdiction of the court is alleged under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202. It is also alleged that this is a class action. The plaintiffs' claim is that defendant in his conduct and practices as a justice of the Dorchester court maliciously and purposefully acted outside the scope of his authority and jurisdiction to coerce, intimidate, harass and discriminate against welfare recipients and to interfere with their federal statutory rights in violation of the first, fourth, fifth,

eighth, ninth and fourteenth amendments to the United States Constitution.

### Complaint

The gist of the complaint may be stated as follows. It has been defendant's repeated practice to attempt to redetermine the eligibility of welfare recipients for the receipt of public assistance. It has been his repeated practice to harass, intimidate, humiliate and discriminate against welfare recipients by: (a) inquiring of women "who come in contact" with the court whether they are welfare recipients, and, if they are, telling them they are required to sign a criminal nonsupport complaint against their husbands or the fathers of their children; (b) informing female welfare recipients that unless they sign nonsupport complaints the Department of Public Welfare will terminate their welfare benefits; (c) attempting to humiliate welfare recipients by asking them questions about their family life and their sexual behavior; (d) ordering welfare recipients to reimburse money to the Department of Public Welfare; (e) prosecuting as well as judging cases of criminal nonsupport against defendants who are welfare recipients; (f) convicting welfare recipients of nonsupport without any factual basis; and (g) ordering welfare recipients to tell the Department of Public Welfare to terminate their welfare benefits. Persons who are not welfare recipients who appear in the Dorchester court are not subject to such practices. Recipients of public assistance are deprived of equal protection of the laws when they become involved in any proceeding before the Dorchester court by defendant treating them differently than all others before the court, who are not recipients of public assistance.

### Evidence

The case came on to be heard by the court without a jury on the testimony of witnesses called by plaintiffs, the deposition of the chief probation officer of the Dorchester court, admissions of fact by defendant, and interrogatories to defendant and his answers thereto. The defendant did not otherwise appear as a witness at the trial. This memorandum contains the findings and rulings of the court, Rule 52, Fed.R.Civ.P.

### Findings

■ At the trial of this case no evidence was offered of inquiries by defendant addressed to welfare recipients about their "sexual behavior", nor was any reliable evidence offered of defendant's convicting welfare recipients of nonsupport "without any factual basis". These allegations of the complaint are without foundation.

■ When the defendant became the presiding justice of the Dorchester court in 1962, it was the practice to refer each applicant for a nonsupport complaint to the probation officer who would, if there was venue of the case, attempt to work out the support problem without resort to criminal proceedings. In this informal proceeding efforts were made to bring husband and wife together in the probation office, to advise the husband concerning the support laws, to encourage him to provide support, to provide family counselling when appropriate, and to seek hospitalization or assistance from AA (Alcoholics Anonymous), if alcohol was a problem. The object of the informal proceeding was to prevent embarrassment to husband and wife and, if feasible, to keep the family together. The procedure extended also to cases of nonsupport against fathers of illegitimate children. The informal procedure was encouraged by the chief justice of the Massachusetts District Courts. Most of the cases handled by the informal procedure were adjusted without the issuance of criminal complaints.

About a year following his appointment as presiding justice, the defendant instructed probation officers attached to the court to discontinue the informal adjustment procedure in cases of applicants who were receiving public assistance. Such applicants were referred to

the clerk of the court who determined whether a criminal complaint would issue. If the complaint issued, the case would be tried to the court. Denial of the opportunity for consideration under the informal procedure to all such applicants deprived them of the benefits which accrued from the procedure. This practice of discriminating against welfare recipients continued until late 1969.

The informal procedure was itself discontinued in all nonsupport cases in late 1969. Since that time, all nonsupport cases, whether or not the applicant for the complaint is a welfare recipient, have been handled by the police, and in each case a determination is made by the clerk of the court whether a complaint is to issue. The discontinuance of the informal procedure was ordered by the chief probation officer because he was of the opinion there was doubtful legal authority for probation officers to adjust any case brought to the court. There is no present intention on the part of the defendant or the chief probation officer to reinstitute the informal procedure.

■ There was evidence that defendant entered orders for bail in varying amounts in nonsupport cases. It is the contention of the plaintiffs that the defendant maliciously and purposefully discriminated against recipients of public assistance by setting money bail in their cases in higher amounts than in other nonsupport cases. There is no persuasive evidence that the defendant engaged in such conduct or practice. Plaintiffs introduced evidence from a study of bail in the Massachusetts District Courts by the Lawyers Committee for Civil Rights under Law which revealed that money bail was consistently higher in the Dorchester District Court than in other district courts for all categories of offenses. There was no evidence from this study, however, of any discrimination by the defendant between welfare recipients and others in the setting of bail. There was no showing either that the variations in the amount of bail were not accounted for by de-fendant's considering facts relevant to pretrial release, or that the defendant imposed unreasonable conditions for pretrial release in the nonsupport cases of welfare recipients. Plaintiffs' contentions rest on the observations of a probation officer, who was not present in court observing defendant's conduct in all nonsupport cases when bail was set, who had made no study of such cases, who offered no relevant facts on the issue of pretrial release in the cases he observed, but who had, nevertheless, formed the impression that bail set by defendant appeared higher in those cases involving welfare recipients. The court finds that plaintiffs fail to show malicious and purposeful discrimination by defendant against welfare recipients in his conduct or practices in setting bail.

■ From time to time the defendant directed women appearing before the court in other matters to sign criminal nonsupport complaints against husbands or fathers of their children. Such directions were given to plaintiff Eleanor C. Haley, when she appeared in the juvenile session of the court for the purpose of observing proceedings against two of her juvenile children; to plaintiff Mary Brothers, when she appeared as defendant in a summary process proceeding in the court; to one Sylvia Williams, when she appeared as defendant in the court to answer to a complaint that she gave a false name to a police officer. All these women were welfare recipients. Defendant gave similar directions to other women, also recipients of public assistance. But it is clear he also gave similar directions to women who were not recipients of public assistance. Putting to one side at this time questions of the legality and propriety of the defendant's orders, it was shown that in certain instances probation officers advised the defendant the nonsupport complaints should not issue. Defendant usually followed the probation officers' advice. Furthermore, not all women ordered to sign a criminal nonsupport complaint complied with defendant's orders.

There was no evidence of any repeated or regular practice or policy on the part of the defendant to single out women recipients of public assistance. There is abundant evidence to show it was his practice or policy to make such orders when he suspected that a woman or her children were not being supported by her husband whether or not she was a welfare recipient. There were more women who were recipients of welfare than nonrecipients ordered to sign complaints, but these differences did not result from systematic discrimination by defendant against welfare recipients.

In certain instances defendant instructed probation officers to write letters to the Massachusetts Department of Public Welfare when a woman welfare recipient refused to sign a nonsupport complaint or refused to testify in an illegitimacy proceeding. Copies of these letters were sent to members of the Massachusetts General Court. It is not alleged and the evidence does not prove that giving such instructions was a regular and repeated practice of defendant. It was the defendant's view that a determination by the Department of Public Welfare that a person or family was eligible for welfare benefits did not bind him in the performance of his judicial duties in nonsupport cases.

As a justice of the Dorchester court, defendant has heard nonsupport cases involving recipients of public assistance and has made findings of guilt. In several cases, after finding that the husbands or fathers were guilty of nonsupport, the defendant ordered the convicted persons to pay money to the probation officer for reimbursement to the Department of Public Welfare for assistance previously given to wives or children. In such cases defendant's frequent practice was to equate the support order with the amount received by the family in public assistance. In one case the convicted person was ordered to make payments of support when it appeared his sole resources were welfare funds. It was claimed at the trial that defendant made guilty findings in non-

support cases against persons disabled and hospitalized at the time of trial, but no medical evidence or other persuasive evidence was offered to show the condition of the person at the time material to the nonsupport charge. Defendant sometimes ordered cases continued for disposition, and simultaneously ordered the convicted husbands to find jobs and to get the family off the welfare rolls during the period of the continuance. The facts described in this paragraph were not shown to be the regular and repeated practice in cases of welfare recipients.

When the probation officers were handling nonsupport cases under the informal adjustment procedure, probably the majority of nonsupport cases brought to their attention involved recipients of public welfare. On several occasions defendant expressed the view that a particular welfare recipient was a fraud, or that social workers appeared "too generous" in dealing with welfare matters, or that taxpayers' money was being wasted. It is clear from the evidence presented that the defendant took a dim view of the administration of the Massachusetts welfare system as he observed cases involving welfare recipients in the Dorchester court, that he frequently gave voice to his disapproval of the administration of the system, and that he believed certain recipients were not entitled to welfare payments. It is also clear that in directing women to sign criminal nonsupport complaints and when ordering welfare recipients to take themselves off the welfare rolls, defendant often used language which was calculated to coerce and intimidate. There was, however, no showing that any welfare recipients who appeared before the court were prosecuted for fraud or had their welfare assistance terminated, suspended or reduced by the Department of Public Welfare as a result of any action by the defendant.

Plaintiffs allege that the action is brought on their own behalf and for their children, and on behalf of the class they describe as

all other families who are recipients of public welfare and who presently have a family member involved in proceedings, whether civil, criminal, or juvenile, in the Municipal Court of the Dorchester District or who may in the future become involved in any such proceedings in the Municipal Court of the Dorchester District.

It is clear such a class exists. The court is satisfied that plaintiffs fairly represent the members of the class.

It was the common practice of probation officers, under instructions from the defendant, to make inquiry of women appearing in the probation office of the Dorchester court whether they were recipients of public welfare, and if so, whether nonsupport complaints against husbands or fathers of children had been filed. Similar inquiries were frequently made by the defendant of female witnesses in cases before him. The obvious purpose of the inquiries was to determine whether nonsupport cases were pending in the Dorchester court involving persons found to be welfare recipients.

Upon the basis of the foregoing findings, the claims of the plaintiffs raise the question whether the defendant deprived the plaintiffs, or any of them, or any member of the class represented by plaintiffs, "of any rights, privileges, or immunities secured by" the due process and equal protection clauses of the fourteenth amendment to the United States Constitution, and, if such deprivation is shown, whether he is answerable to plaintiffs in this action.

### Discussion

The complaint alleges claims under the Civil Rights enactments now codified as 42 U.S.C. § 1983. Under that statute a federal cause of action is given to a person who has been deprived by a state officer of a federal right, such as due process of law, or the equal protection of the laws of the state.

 The defendant is a justice of the Municipal Court of the Dorchester District, a court of superior and general

jurisdiction, with original jurisdiction of misdemeanors, *see* Mass.Gen.Laws ch. 218, §§ 1, 4, 26, including the crimes of nonsupport of a wife or children, *see* Mass.Gen.Laws ch. 273, §§ 1 (as amended) and 2. The defendant as such justice is immune from an action brought against him under 42 U.S.C. § 1983 seeking recovery of damages. *See* Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Bauers v. Heisel, 361 F.2d 581 (3rd Cir. 1966). The doctrine of judicial immunity, however, has not been extended to cases in which equitable relief alone has been sought. Several federal courts have held that equitable relief will lie against a judicial officer whose conduct violates the Civil Rights Acts. *See, e. g.,* Koen v. Long, 302 F.Supp. 1383, 1387 (E.D.Mo.1969) and Stambler v. Dillon, 288 F.Supp. 646, 649 (S.D.N.Y.1968). Although the Supreme Court has not spoken directly in a case where equitable relief against a judicial officer was the object, it has in at least one case issued a temporary restraining order against a state court judge, and on final hearing reversed a district court's refusal to grant a permanent injunction. *See* Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969). Thus the court determines it has jurisdiction of this case under the federal statutes invoked.

### I

 The actions of a member of a state judiciary, when acting in his official capacity and whose orders are enforced by the state, constitute state action within the meaning of the fourteenth amendment. *See generally* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065 (1969). *See also* Ex parte Virginia, 100 U.S. 339, 346–348, 25 L.Ed. 676 (1880). Not every act of a state judge deemed improper or offensive, however, violates rights, privileges or immunities protected by the amendment. When the power of the federal judiciary is invoked to examine alleged and proved acts of a state officer, a distinction must be drawn be-

tween actions which violate *federally* protected rights of the individual, and other actions which, although offensive to all our ideas of decency, are not adjudicative of fundamental rights or do not adversely affect fundamental interests. Actions of the latter class are not ordinarily viewed as state action within the fourteenth amendment, and the distinction should not be ignored merely because the actions of a state judge are claimed to be harsh or oppressive. The states themselves have a large capacity for self-correction of their institutions and officers. But when violations of fundamental rights or interests of the individual are both alleged and proved, which controlling law has determined to be protected under the Constitution and laws of the United States, intervention by the federal district court to grant appropriate relief is justified. *See* Nolen v. Wilson, 372 F.2d 15 (9th Cir. 1967), cert. denied, 387 U.S. 948, 87 S.Ct. 2085, 18 L.Ed.2d 1337 (1967).

### II

■ Plaintiffs have alleged that defendant's conduct in singling out welfare recipients appearing in his court for special treatment violates the equal protection clause of the fourteenth amendment. The Supreme Court has held that the equal protection clause is violated where "an element of intentional and purposeful discrimination" is shown. Snowden v. Hughes, 321 U.S. 1, 8, 64 S. Ct. 397, 401, 88 L.Ed. 497 (1943). The Court in *Snowden* made it clear that although a discriminatory purpose on the part of a state officer may not be presumed, such intention may "appear on the face of the action taken with respect to a particular class or person". *Id.* at 8, 64 S.Ct. at 401. Deprivation of equal protection of the laws may, of course, also be shown by extrinsic evidence of the discriminatory purpose of a state officer to impose burdens on one individual or class not imposed on others.[1]

■ The right which plaintiffs as welfare recipients claim in this case is the right to be treated evenhandedly by the defendant, in his capacity as a justice of the court, with all other citizens appearing before the Dorchester District Court. There can be no doubt that when individual rights are involved all must stand on an equal footing before the bar of justice. Furthermore, a classification which serves as a basis for unreasonable and arbitrary discrimination between persons in meting out justice violates the fourteenth amendment. There can be no equal justice where the kind of hearing one gets in court, or the disposition of his case, depends upon the amount or source of his money.

1. In scrutinizing alleged violations of the fourteenth amendment equal protection clause, the Supreme Court has applied standards ranging from virtual presumption of constitutionality of state action (*see, e. g.,* Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937) (involving matters of economic regulation)), to standards requiring the state or its officers to show strong justification for their acts where certain personal interests, deemed fundamental, are involved. *See, e. g.,* Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (voting rights) ; Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (rights in criminal procedure) ; Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (rights in education). Further, in light of the equal protection clause the Court has held certain classifications by race, lineage and national origin to be per se suspect, *see, e. g.,* Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (wartime exclusion of persons of Japanese ancestry from West Coast military area). It appears that at least for certain purposes, where the interests are deemed fundamental, wealth is also a per se suspect classification. *See* Harper v. Virginia Bd. of Elections, *supra*; Griffin v. Illinois, *supra*; Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). *See generally* Note, Discriminations Against the Poor and the Fourteenth Amendment, 81 Harv.L.Rev. 435 (1967).

 Applying these principles to the findings of the court concerning defendant's conduct under color of law, the court concludes that there is no persuasive showing that plaintiffs, all welfare recipients, were denied equal protection of the laws in violation of the fourteenth amendment (1) in the setting of bail in nonsupport cases, (2) in the disposition of nonsupport cases, including imposition of sentences and terms of support orders, (3) in ordering restitution to be made to the Department of Public Welfare for previously granted assistance by the Department, (4) in ordering, directing or admonishing accused persons in nonsupport cases to get their families off the welfare rolls, and (5) in directing probation officers to write letters in certain cases to the Department of Public Welfare, and to members of the Massachusetts Legislature, calling attention to the details of the cases.

 As a justice of the Dorchester District Court the defendant was not deprived of jurisdiction over a welfare recipient, on a complaint for nonsupport, by the determination of the Department of Public Welfare that the recipient or his family was eligible for public assistance benefits. *See* Mass.Gen.Laws ch. 273 §§ 1 (as amended), 3, 5; Petition of Kelley, 292 Mass. 198, 197 N.E. 861 (1935). While it was a matter beyond defendant's judicial power or authority to inform the Department of Public Welfare and the Legislature of the details of certain cases of welfare recipients which came to his attention, there is no showing that federally protected rights of plaintiffs or members of the class were violated by these actions, or indeed that any sanctions at all flowed from them.

 The practice of denying to welfare recipients the benefits which accrued from the informal procedure of adjustment of nonsupport claims did, however, constitute invidious discrimination against them, and deprived them of equal protection of the laws in violation of the fourteenth amendment because it was arbitrary and based on a classification, namely source of income, completely unrelated to the purposes to be served by the informal procedure. Although the Commonwealth was not under a duty to provide such informal means, it is clear once state officers undertook to provide the adjustment procedure, the defendant could not, consistent with the requirements of the fourteenth amendment deny access to the same procedure to persons before the court merely because they received public assistance, *cf.* Griffin v. Illinois, *supra.* Federal intervention would ordinarily be justified based on equitable principles. Yet because the informal procedure has been abolished in all nonsupport cases, and is not likely to be reestablished, injunctive relief at this time aimed at preventing further denial of access to such procedure would be inappropriate. Considering the same equitable principles, the court concludes that declaratory relief likewise is inappropriate.

### III

 While there is no proof of defendant's intentional and purposeful discrimination against welfare recipients in his practice of ordering women to sign nonsupport complaints against their husbands or the fathers of their children, there is proof that the actions of defendant in giving such orders were coercive and intimidating, and in many cases were directed to women who did not intend and were not willing to file formal complaints. Certain complaints signed under such circumstances were thereafter prosecuted. It is alleged that this coercive practice violated the fourteenth amendment rights of women welfare recipients who were coerced to sign complaints, and of male welfare recipients who were prosecuted for nonsupport upon such complaints. The allegations and proof raise the question whether defendant's coercive practice constitutes

violation of the due process clause of the fourteenth amendment.

It is not clear whether defendant believed he possessed the authority to compel a person to sign a complaint, for there is no evidence of his taking any steps to enforce his orders against the one or two women who ignored them. The Massachusetts statutes authorize a justice of the Dorchester District Court to "receive" a complaint, *see* Mass.Gen. Laws ch. 218, §§ 32, 35, 35A, but there is no authority allowing a justice to order or compel one person to sign a complaint against another. *Cf.* Hobbs v. Hill, 157 Mass. 556, 32 N.E. 862 (1893) (a person *willingly* making an oral complaint may be required to reduce it to writing). There is proof, however, of women having no intention or purpose of making nonsupport complaints, who felt sufficiently intimidated by defendant's orders that they signed complaints, albeit unwillingly. Laymen, especially when they are not represented by counsel, cannot be expected to know the extent of the powers of a judge. The usual course for a layman is to comply with coercive orders issued by a judge in court, clothed with the mantle of authority. It would be quite unusual for him to refuse, and in fact defendant's orders were normally complied with. To most persons appearing before him defendant's actions under the circumstances had the color of judicial power and authority, and are therefore found to be state action.

The question is whether there was a denial of due process in the cases where the defendant appears to have merged in himself the functions of both accuser and judge. The Supreme Court has dealt with the question whether merger of prosecutorial and adjudicatory functions in the same official constitutes a denial of due process. In Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950) it was stressed that it would be unfair to commingle the prosecuting and decision-making functions of the Immigration Service in deportation proceedings, and that to do so might bring the procedure "into constitutional jeopardy". In In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) the Court held the due process clause forbade a judge, who had charged witnesses with contempt during a "one man grand jury" which he conducted, from presiding at their subsequent trial on the contempt charge. In discussing the due process clause the Court said

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end . . . no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Id.* at 136, 75 S.Ct. at 625.

In Figueroa Ruiz v. Delgado, 359 F.2d 718 (1966) the Court of Appeals of this Circuit held that a procedure in the District Court of Puerto Rico violated the due process clause, where the judge in a criminal case called and examined witnesses himself because the Commonwealth of Puerto Rico provided no prosecutor. In the opinion the court said

> We are satisfied that federal or state court procedure, by which the judge was the one to introduce the government's evidence, and cross-examine on the government's behalf, would neither satisfy the appearance of justice nor be considered free of the "possible temptation . . . not to hold the balance nice, clear and true be-

tween the State and the accused," and hence would deny the accused due process of law.[2] *Id.* at 721–722.

If not contrary to the letter of the 1964 amendment to Mass.Gen.Laws, ch. 218, § 35, such acts appear to violate the spirit of the amendment, which specifically requires that any justice of the district court who issues a complaint "shall be disqualified from presiding over a trial on the merits of any matter brought to trial because of such complaint".

As to the question whether there were violations of the rights of women recipients of welfare who were coerced to sign complaints, there has been no showing that they were subjected to any sanctions, or deterred from access to the courts for redress of claimed rights, as a consequence of defendant's orders. Had there been such, there appears little doubt that they would have been denied due process. But federal courts must refrain from interference with state courts unless violations of the canons of fundamental fairness have been clearly shown. *See, e. g.*, Nolen v. Wilson, 372 F.2d 15 (9th Cir. 1967), cert. denied, 387 U.S. 948, 87 S.Ct. 2085, 18 L.Ed.2d 1337 (1967). In this case women ordered to swear out nonsupport complaints who did so unwillingly may have believed that the court could impose sanctions to enforce its orders, but there is no evidence that such sanctions were ever imposed or could have been enforced. In the absence of such showing the court is unable to find a violation of fourteenth amendment due process. It may be that conduct by the defendant which resulted in women unwillingly swearing out nonsupport complaints against their husbands and being further involved in the subsequent prosecution might be found to violate other rights, for example the right of privacy, protected by the Constitution through the first amendment. *See* Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Griswold v. Connecticut, 381 U.S. 479, 494, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J. concurring); Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed.2d 944 (1928) (Brandeis, J. dissenting). But these rights were not asserted by the plaintiffs and the court does not undertake to decide them.

Accordingly, judgment may be entered declaring that the practice of the defendant of trying complaints on the merits which were signed by women welfare recipients pursuant to his orders against their will denies the accused in such cases due process of law in violation of the fourteenth amendment.

the appearance of that degree of fundamental fairness essential to the concept of justice, and hence denies the accused in such cases due process of law.

---

2. Thus it is clear that defendant's practice of trying coerced complaints on their merits injects an element of improper interest into the procedure and otherwise lacks