Donna DOE et al.

v.

Nicholas NORTON, Individually and as
Commissioner of Welfare of the State
of Connecticut.

Sharon ROE and Dorothy Poe, Individual-
ly and on behalf of others similarly
situated

v.

Nicholas NORTON, Individually and as
Commissioner of Welfare of the State
of Connecticut.

Civ. Nos. 15579, 15589.

United States District Court,
D. Connecticut.

Sept. 5, 1973.

66

Douglas M. Crockett, Raymond J. Kelly, Willimantic, Conn., Robert Beckman, Stamford, Conn., Elliot Taubman, Norwich, Conn., David Rosen, Edw. Dolan, New Haven, Conn., for plaintiffs in Civ. No. 15579.

Frank Cochran, New Haven, Conn., David Rosen, Edward Dolan, New Haven, Conn., for plaintiffs in Civ. No. 15589.

James M. Higgins, Michael Anthony Arcari, Asst. Atty. Gen., East Hartford, Conn., for defendant.

Before TIMBERS, Circuit Judge, and BLUMENFELD and NEWMAN, District Judges.

## MEMORANDUM OF DECISION
## FINDINGS OF FACT and
## CONCLUSIONS OF LAW

BLUMENFELD, District Judge:

By this action, the plaintiffs [1] challenge the constitutionality of Public Act 439 § 4 (1971), Conn.Gen.Stats. § 52–440b.[2] The challenged statute is part of a comprehensive legislative scheme whereby the mother of any illegitimate child is legally obligated to disclose the name of her child's biological father and to prosecute a paternity action against the named putative father.[3] The plaintiffs rely upon the Civil Rights Act, 42 U.S.C. § 1983, for a cause of action and upon 28 U.S.C. § 1343(3) for this court's jurisdiction. In addition to injunctive and declaratory relief, 28 U.S.C. § 2201 et seq., they seek to maintain their suit as a class action. Fed.R.Civ. P. 23.

Because they sought to enjoin the operation of a state statute, this three-judge district court was convened. 28 U.S.C. §§ 2281, 2284.[4]

1. Because of the special circumstances of this case, plaintiffs sue under fictitious names. They are all unwed mothers of children who sue on their own behalf as well as on behalf of their minor children.

2. Conn.Gen.Stats. § 52–440b provides:
"(a) If the mother of any child born out of wedlock, or the mother of any child born to any married woman during marriage which child shall be found not to be issue of the marriage terminated by a divorce decree or by decree of any court of competent jurisdiction, fails or refuses to disclose the name of the putative father of such child under oath to the welfare commissioner, if such child is a recipient of public assistance, or to a selectman of a town in which such child resides, if such child is a recipient of general assistance, or otherwise to a guardian or a guardian ad litem of such child, such mother may be cited to appear before any judge of the circuit court and compelled to disclose the name of the putative father under oath and to institute an action to establish the paternity of said child.
"(b) Any woman who, having been cited to appear before a judge of the circuit court pursuant to subsection (a), fails to appear or fails to disclose or fails to prosecute a paternity action may be found to be in contempt of said court and may be fined not more than two hundred dollars or imprisoned not more than one year or both."

3. Failure to comply with this duty may result in the mother being held in contempt of court, and fined not more than $200 and/or imprisoned for not more than one year. Conn.Gen.Stats. § 52–442a as amended by Public Act 439 § 3(b) (1971) provides for a judgment
"for support of the child by payment of a weekly sum until the child attains the age of eighteen years, together with provision for reimbursement for the lying-in expense, accrued maintenance . . . ."

4. The decision granting the plaintiffs' motion to convene a three-judge district court and denying the plaintiffs' motion for preliminary injunctive relief is reported at 356 F. Supp. 202 (D.Conn.1973). Issues adequately discussed in that decision will not be restated here and familiarity with that opinion is assumed.

## I.

### The Parties

The plaintiffs in this suit are all unwed mothers of illegitimate children, allegedly eligible to receive welfare benefits under the Aid to Families with Dependent Children (AFDC) program of the Social Security Act of 1935, Sections 401 et seq., 42 U.S.C. §§ 601 et seq. (hereinafter the Act). They seek to represent the class of individuals similarly situated as well as their children.

The defendant is the Commissioner of Welfare, Nicholas Norton, sued in his individual and representative capacity, and charged with the responsibility of implementing the provisions of this statute with regard to individuals presently receiving welfare benefits.

## II.

### Class Action

The plaintiff mothers who instituted this action in their own behalf and in behalf of their children moved for certification of this case as a class action under Fed.R.Civ.P. 23(a) and (b)(2). Of course, the plaintiff mothers, as guardians of their respective children, may sue on their behalf. Thus, the children are not only proper, but necessary parties. However, some of the interests which the mothers urge relating to the subject matter of this action are neither typical of nor congruent with the interests of their children, but actually conflict with them in several respects. In light of this conflict of interests between the mothers and their children, the court, on its own motion, appointed counsel to represent the interests of the children.

. It is clear that the plaintiffs, if regarded as members of a class which includes their children as well as themselves, do not meet the condition of Rule 23(a)(4) that "the representative parties will fairly and adequately protect the interests of the class." Since this is in all other respects properly a class under Rule 23, the obstacle presented by

this claim to represent an overly broad class may easily be obviated by dividing the mothers and their children into appropriate separate subclasses. See 3B Moore's Federal Practice, § 23.07(3). The classes consist of:

(1) those mothers receiving AFDC assistance who refuse to comply with § 52–440b; and

(2) the illegitimate children of those mothers.

See Doe v. Shapiro, 302 F.Supp. 761, 762 n. 3 (D.Conn.1969), appeal dismissed, 396 U.S. 488, 90 S.Ct. 641, 24 L.Ed.2d 677, rehearing denied, 397 U.S. 970, 90 S.Ct. 991, 25 L.Ed.2d 264 (1970).

## III.

### Claims

The plaintiffs allege that as applied to them Conn.Gen.Stats. § 52–440b violates several constitutional rights and safeguards, including due process, equal protection, and the right of privacy. In addition, they contend that the Connecticut statute is inconsistent with the underlying policies of the Act and is therefore invalid under the supremacy clause.

As will appear, their arguments in support of these contentions overlap and are variations of a single theme, namely that in the opinion of the plaintiff mothers the adverse consequences which mother and child may suffer by reason of the procedures employed by the state to enforce the uncontested obligation of a man to support his child born of an unwed mother far outweigh any resultant benefit to them or to society. Without questioning the sincerity with which the plaintiff mothers hold their views, it appears to the court that the legal semantics in which they have dressed their particular views about morality, propriety, and psychology do not furnish any constitutional or statutory basis for striking down Connecticut's statute. While some of their arguments are clearly non-starters which do not merit extended discussion, the court will consider all of them seriatim.

## IV.

### Statutory Conflict

■ We proceed first to examine the merits of the plaintiffs' claim that Conn.Gen.Stats. § 52–440b is so in conflict with the AFDC Act that it must fall under the supremacy clause.[5] The plaintiffs' principal argument is that this statute is "inconsistent with the basic purpose and objective of the Social Security Act." A brief analysis of relevant portions of that Act is needed to place their argument in proper context.

### A. Social Security Act—AFDC

Under the AFDC program, in which Connecticut participates, financial assistance is provided for dependent children and their families. The program is financed with matching funds and administered by the states. As the Supreme Court has noted in King v. Smith, supra, 392 U.S. at 316–317, 88 S.Ct. at 2133:

"The AFDC program is based on a scheme of cooperative federalism. See generally Advisory Commission Report, supra, at 1–59. It is financed largely by the Federal Government, on a matching fund basis, and is administered by the States. States are not required to participate in the program, but those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of Health, Education, and Welfare (HEW). 49 Stat. 627, 42 U. S.C. §§ 601, 602, 603, and 604. See Advisory Commission Report, supra, at 21–23. The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by HEW. 49 Stat. 627, as amended, 42 U.S.C. § 602 (1964 ed. Supp. II). See also HEW, Handbook of Public Assistance Administration, pt. IV, §§ 2200, 2300 . . . . ." (Footnote omitted). .

■ Within this broad statutory framework, the states are empowered to enact legislation intended to further the policies of the Act, with the caveat that in so doing they may not impinge on the constitutional rights of the recipients or contravene the supremacy clause by promulgating legislation squarely in conflict with the federal law. See, e. g., King v. Smith, supra, 392 U.S. at 318, 88 S.Ct. 2128. In testing whether the Connecticut statute contravenes the Act, we follow the instructions in New York State Dept. of Social Servies v. Dublino, 413 U.S. 405, 423 n. 29, 93 S.Ct. 2507, 2518, 37 L.Ed.2d 688 (1973) quoted in the margin.[6]

---

5. "That the three-judge court itself not only had jurisdiction but would have been obliged to adjudicate this statutory claim in preference to deciding the original constitutional claim in this case follows from King v. Smith, 392 U.S. 309 [88 S.Ct. 2128, 20 L.Ed.2d 1118] (1968), where, on an appeal from a three-judge court, we decided the statutory question in order to avoid a constitutional ruling. 392 U.S., at 312 n. 3 [88 S.Ct., 2130]." Rosado v. Wyman, 397 U.S. 397, 402, 90 S.Ct. 1207, 1212, 25 L.Ed.2d 442 (1970).
See also, King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Harmon v. Brucker, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958).

6. "In considering the question of possible conflict between the state and federal work programs, the court below will take into account our prior decisions. Congress 'has given the States broad discretion,' as to the AFDC program, Jefferson v. Hackney, supra, at 545 [of. 406 U.S. 535, at 1731 of 92 S.Ct. 1724, 32 L.Ed.2d 285]; see also Dandridge v. Williams, supra, at 478 [of 397 U.S. 471, at 1158 of 90 S.Ct. 1153, 25 L.Ed.2d 491]; King v. Smith, supra, at 318–319 [of 392 U.S., at 2133–2134 of 88 S.Ct.], and 'so long as the State's actions are not in violation of any specific provision of the Constitution or the Social Security Act,' the courts may not void them. Jefferson, supra, at 541 [of 406 U.S., at 1729 of 92 S.Ct.]. Conflicts, to merit judicial rather than co-operative federal-state resolution, should be of substance and not merely trivial or insubstantial. But if there is a conflict of substance as to eligibility provisions, the federal law of course must control. . . . ."

■ The AFDC program, as with many pieces of social welfare legislation, evidences disparate values and competing policies which often appear to be in conflict. We take as our touchstone the settled proposition that with regard to dependent children ". . . protection of such children is the paramount goal of AFDC." King v. Smith, *supra,* 392 U.S. at 325, 88 S.Ct. at 2137 (footnote omitted). Since the implementation of Connecticut's statute may lead to the incarceration of the mother of a dependent child, the plaintiffs contend that it is implacably inconsistent with that goal. For reasons which will appear, we cannot accept that assessment.

The AFDC statute contains a frank recognition of the importance of determining the paternity of those needy children born out of wedlock. Title 42 U.S.C. §§ 602(a)(17)(A)(i) and (ii) provide:

"(A) for the development and implementation of a program under which the State agency will undertake—

"(i) in the case of a child born out of wedlock who is receiving aid to families with dependent children, to establish the paternity of such child and secure support for him, and

"(ii) in the case of any child receiving such aid who has been deserted or abandoned by his parent, to secure support for such child from such parent (or from any any other person legally liable for such support), utilizing any reciprocal arrangements adopted with other States to obtain or enforce court orders for support . . . ." [7]

The question presented is thus not whether Connecticut may act to estab-lish the paternity of and insure the paternal support for children who qualify for AFDC benefits, a proposition we find firmly established, but rather whether the procedure which it has selected to achieve this end is in such "direct and positive" conflict with the Act that "the two acts cannot 'be reconciled or consistently stand together.' " Kelly v. Washington, 302 U.S. 1, 10, 58 S.Ct. 87, 92, 82 L.Ed. 3 (1937). See Snell v. Wyman, 281 F.Supp. 853, 869 (S.D.N.Y. 1968) (three-judge district court), aff'd, 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

**B. *The Connecticut Statute and Its History***

In order to put the present case in perspective it is important to recall earlier attempts by Connecticut to solve this problem.

■ Prior to enacting the challenged statute, Connecticut attempted by departmental regulations to establish the paternity of those children of unwed mothers who refused to assist in the establishment of their children's paternity by denying AFDC benefits first to the children and later to their mothers themselves. Although the state's laws were challenged on not insubstantial constitutional grounds, the three-judge district court which heard that case enjoined their continued operation on the ground that they imposed an additional and impermissible ground of eligibility in conflict with the criteria established by Congress under the AFDC program. Doe v. Shapiro, *supra,* 302 F.Supp. 761; Doe v. Harder, 310 F.Supp. 302 (D. Conn.), appeal dismissed for want of ju-

---

7. The Senate Finance Committee noted with regard to the above cited 1967 amendment to the Social Security Act:

"A substantial proportion of the persons receiving aid under the AFDC program are eligible because of the desertion by a parent of the child. Several provisions are already in the law and more are proposed under the bill to provide additional tools to States and to impose further obli-gations on them to assure the determination of legal responsibility for support and to make efforts to make these collections. The committee believes it is essential to make certain that all legally responsible parents of sufficient means make their appropriate contribution to the support of their children." S.Rep.No.744, 1967 U.S. Code Cong. & Admin.News at pp. 2834, 2997.

risdiction, 399 U.S. 902, 90 S.Ct. 2202, 26 L.Ed.2d 557 (1970).[8]

The plaintiffs advance the same arguments now that were used then. Yet if we look back we observe that the present Connecticut statute differs from its predecessor regulation in at least two significant particulars. While the operation of this new statute may have the undesirable effect of diminishing the amount of time that a recalcitrant mother will be able to spend with her child,[9] it does not deny to either the mother or the child the benefits of food, clothing or shelter in accordance with their needs. Thus, the particular conflict with the AFDC statute relied upon by all the courts cited in footnote 8, *supra*, namely that the state cannot condition the enjoyment of benefits upon conditions not provided for by Congress, is simply not in this case. In addition, the

8. Several district courts have followed the analysis of and reached the same result as these two Connecticut cases. See, e. g., Story v. Roberts, 352 F.Supp. 473 (M.D.Fla. 1972) ; Doe v. Ellis, 350 F.Supp. 375 (D.S. C.1972) ; Doe v. Gillman, 347 F.Supp. 483 (N.D.Iowa 1972) ; Doe v. Lavine, 347 F. Supp. 357 (S.D.N.Y.1972) ; Saiz v. Hernandez, 340 F.Supp. 165 (D.N.M.1972) ; Saddler v. Winstead, 332 F.Supp. 130 (N.D.Miss. 1971) ; Doe v. Swank, 332 F.Supp. 61 (N. D.Ill.), aff'd summarily sub nom. Weaver v. Doe, 404 U.S. 987, 92 S.Ct. 537, 30 L.Ed.2d 539 (1971) ; Taylor v. Martin, 330 F.Supp. 85 (N.D.Cal.1971), aff'd summarily sub nom. Carleson v. Taylor, 404 U.S. 980, 92 S.Ct. 446, 30 L.Ed.2d 364 (1971) ; Meyers v. Juras, 327 F.Supp. 579 (D.Or.), aff'd summarily, 404 U.S. 803, 92 S.Ct. 91, 30 L.Ed.2d 39, rehearing denied, 404 U.S. 961, 92 S.Ct. 308, 30 L.Ed.2d 280 (1971). In light of these decisions, three of which have been affirmed summarily by the Supreme Court, it was seemingly settled until recently that AFDC benefits could not be denied an otherwise qualified mother or child in an effort to coerce the mother to cooperate with local authorities in establishing her child's paternity. However, on April 30, 1973, HEW adopted a new regulation, 45 C.F.R. § 233.-90(b)(4), effective July 2, 1973, which, while reaffirming the position that a child may not be denied benefits for the refusal of his parent, squarely provides :

"(4) A child may not be denied AFDC either initially or subsequently because a parent or caretaker relative fails to assist :

"(i) in the establishment of paternity of a child born out of wedlock ; or

"(ii) in seeking support from a person having a legal duty to support the child ; *but neither this nor any other provision of these regulations should be construed to require that provision be made by a State in its AFDC program for the maintenance of a parent or caretaker who fails to provide such assistance and AFDC may be denied with respect to such parent or caretaker.*" (Emphasis added).

Here we have a regulation formally adopted by the agency entrusted with the enforcement of the Act which specifically bears on the particular problem presented in Doe v. Shapiro and Doe v. Harder, *supra.* To the extent that it is based on factors emanating from the agency's peculiar competence rather than considerations extracted from judicial decisions, it is entitled to great weight. Cf. Great Northern Ry. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942). Nor is the weight to be accorded to the regulation in construing the statute dependent on strict contemporaneity of the statute and the promulgated regulation. *Id.* at 275, 62 S.Ct. 529 (regulation 13 years after enactment held to merit judicial esteem). See also, CBS v. Democratic Nat'l Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) ; Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ; Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The weight to be given this most recent regulation as evidence that refusal of aid to the parent is consistent with the federal statute in view of judicial constructions of the Act which antedated it presents an interesting question about which we might appropriately reflect. But since we distinguish Doe v. Shapiro and its progeny from the present case on other bases, we leave that exercise for another time.

9. Under Connecticut's regulatory scheme responsible public officials must provide various essential services, including the service of a housekeeper or homemaker, where such services are needed. See Conn.State Welfare Dept. Social Service Policies—Public Assistance (Manual Vol. 1, § 5030 at 8 et seq., effective 8/1/72). And in order to relieve pressure on the family unit resulting from the absence of a parent from the home, 42 U.S.C. § 606(b)(1) provides that aid payments should include an amount "to meet the needs of the relative (or essential person) with whom any dependent child is living." Cf. Dandridge v. Williams, 397 U.S. 471, 496, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (Mr. Justice Douglas dissenting).

statute applies across the board to all mothers of illegitimate children without regard to their or their children's status as AFDC recipients.[10]

Thus, Connecticut's statute furthers a significant purpose of the AFDC program. And unlike the Doe v. Shapiro line of cases outlined above, it does not per se add an additional eligibility requirement to those provided for by the Act.[11] No otherwise qualified recipients will be denied benefits to which they are lawfully entitled by reason of the operation of the statute. While the incarceration of a contemptuous mother may not always be in her child's best interest, this does not establish any irreconcilable conflict between the two acts.

The fact that the federal statute delegates to the states the responsibility of establishing a specific program to accomplish the goal precisely defined by Congress indicates that different programs might be established by the different states to deal with their own local problems.[12] Cf. Askew v. American Waterways Operations, 411 U.S. 325, 93 S. Ct. 1590, 36 L.Ed.2d 280 (1973). That Connecticut may not meet its obligation under 42 U.S.C. § 602(a)(17) by denying benefits to an otherwise qualified child does not mean that it may not impose other sanctions upon the mother appropriate toward that end. The plaintiffs apparently take the position that no method of compulsion upon them is permissible. Surely the fact that the Act stopped short of spelling out the particular method to be used by the states in carrying out the required "program" does not mean that every solution to the problem of obtaining the cooperation of the mothers irreconcilably con-

flicts with the statute. Unlike the situation in Doe v. Shapiro, *supra*, where the operation of the state law was found to directly impinge upon a specific provision of the Act, this statute presents no such "direct and positive" conflict. The specific statutory language hardly provides support for the plaintiffs' argument that the challenged statute is contrary to the underlying theory of the Social Security Act. Their separate contention that the challenged statute is in irreconcilable conflict with these federal provisions is obviously devoid of merit, and we reject it. Connecticut's statute does not violate any specific provision of the Social Security Act. New York State Dept. of Social Services v. Dublino, *supra*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688. Having analyzed Connecticut's statute in relation to the federal statute, we turn next to the plaintiffs' contention that it operates to violate their rights under the Constitution.

## V.

### Constitutional Privacy

A right to privacy, especially marital privacy, recently found to merit constitutional protection, emanates from the "penumbras" of the first, third, fourth, fifth and ninth amendments. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). This was reiterated in Roe v. Wade, 410 U.S. 113, 727, 93 S.Ct. 705, 35 L.Ed.2d 147, 176–177 (1973), where the Court concisely explained that

"[although] [t]he Constitution does not explicitly mention any right of privacy . . . [there is] a line of decisions . . . [wherein] the

---

10. In the absence of any legislative history, the court inquired and was informed that the scope of this statute was intended not only to protect the state's coffers, but also to establish the paternity of all illegitimate children so that they might enjoy the long term psychological and economic advantages to be gained thereby. See Doe v. Norton, *supra*, 356 F.Supp. at 207.

11. Cf. New York State Dept. of Social Services v. Dublino, *supra*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688.

12. Statistics provided by the Connecticut State Department of Health indicate that in recent years about 10% of the children born in Connecticut were born out of wedlock.

Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. . . . These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education." (Citations omitted).

Thus, the question presented is whether an unwed mother's desire to keep secret the name of her child's father is so "fundamental" or "implicit in the concept of ordered liberty" as to require constitutional protection.[13] See Doe v. Norton, *supra,* 356 F.Supp. at 205. The argument of each plaintiff mother is that because a side effect of her participation in legal action to establish the paternity of her child may result in additional strains in family relationships within the home or may unwisely force the permanent severance of relationships with his father,[14] her wish to decide for

13. Even if her desire falls within the boundary of the right of privacy, its regulation may be justified by a compelling state interest through a statute narrowly drawn "to express only the legitimate state interests at stake." Roe v. Wade, *supra,* 410 U.S. at 155, 93 S.Ct. at 728, 35 L.Ed.2d at 178.

14. The plaintiffs contend that the statute denies due process for failure to provide for a hearing to determine in each case whether the disclosure of the name of the father will have such adverse effects upon the plaintiffs as to outweigh its benefits. When an analogous argument was made in a similar context, Wyatt v. United States, 362 U.S. 525, 530, 80 S.Ct. 901, 905, 4 L.Ed.2d 931 (1960), Mr. Justice Harlan responded:

"To make matters turn upon ad hoc inquiries into the actual state of mind of particular women, [who did not want to testify against their husbands] thereby encumbering Mann Act trials with a collateral issue of the greatest subtlety, is hardly an acceptable solution."

Accordingly, we reject that argument in this case.

Although we hold that the Constitution does not require such an analysis to be made in order to sustain the validity of the statute, this does not mean that the sanctions permitted by the statute are likely to be woodenly imposed without regard for impact upon the family.

We are unwilling to assume such an unthinking automatic exercise of judicial power by the state judiciary. In the event of a mother's failure to disclose the father's name, the statute provides that she "may" be found in contempt and "may" be fined or imprisoned. This authorizes the exercise of sound judicial discretion to determine whether in a particular case non-disclosure warrants a finding of contempt or the imposition of penalties. In this regard, the statute

is in marked contrast to other Connecticut disclosure statutes, which provide that in the event a person obligated to furnish information refuses to do so, a state judge "shall commit such person to jail until he testifies . . . ." *E. g.,* Conn.Gen.Stats. § 17–2a (witnesses at welfare department fair hearings) ; Conn.Gen.Stats. § 12–2 (witnesses at tax department hearings) ; Conn.Gen.Stats. § 30–8 (witnesses at liquor control commission hearings). We need not anticipate at this point the variety of situations that will confront the state circuit court judges before whom contempt citations will be sought. It is sufficient in this litigation, which attacks the statute on its face, to note that the statute, in its application, does not preclude and, indeed, appears to specify the exercise of sound judicial discretion.

In a related argument the plaintiffs contend that in requiring disclosure of the father's name in all cases, and prohibiting the mother from contesting the desirability of that disclosure in any particular case, the statute imposes an unconstitutional, irrebutable presumption that disclosure is in the best interest of the child. This contention, if accepted, would stretch the concept of an irrebutable presumption out of recognition. The irrebuttable presumptions struck down in Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), and Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), all concerned issues of fact: the fault of a driver involved in an accident; and the fitness as a father of a man who sired an illegitimate child to be its guardian. The present case presents no presumption of fact in any sense. Connecticut's avowed goal is getting fathers to support their children, illegitimate or otherwise. This is simply on a different plane from the question of whether, in a given child's case, it is better that his father's identity remain undisclosed. It is a legislative value judgment about the

herself whether a paternity action should be brought is so closely related to the concept of privacy that it merits being included within the constitutional guarantee of personal privacy. This contention calls for analysis of the two separate aspects which conjoin to define that right. One has to do with the power to make inquiry and the other with the extent of the particular inquiry sought to be made.

### A. *The Scope of the Power*

 The broad scope of the government's power to compel testimony and the rationale on which it is based are fully delineated in Kastigar v. United States, 406 U.S. 441, 443–444, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212 (1972):

"The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence. The power with respect to courts was established by statute in England as early as 1562, and Lord Bacon observed in 1612 that all subjects owed the King their 'knowledge and discovery.' While it is not clear when grand juries first resorted to compulsory process to secure the attendance and testimony of witnesses, the general common law principle that 'the public has a right to every man's evidence' was considered an 'indubitable certainty' which 'cannot be denied' by 1742. The power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor. The first Congress recognized the testimonial duty in the Judiciary Act of 1789, which provided for compulsory attendance of witnesses in the federal courts. Mr. Justice White noted the

importance of this essential power of government in his concurring opinion in Murphy v. Waterfront Comm'n, 378 U.S. 52, 93–94, 84 S.Ct. 1594, [1611] 12 L.Ed.2d 678, 704 (1964):

'Among the necessary and most important of the powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand juries or agencies. See Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979. Such testimony constitutes one of the Government's primary sources of information.' " (Footnotes omitted).

As a broad proposition, this power extends to and includes with particular pertinence, those situations in which the testimony sought to be elicited may prove embarrassing, or otherwise impinges upon the sensitivities of the witness whose testimony is sought. As a noted commentator has stated:

"[T]he sacrifice may be of his privacy [or] of the knowledge which he would preferably keep to himself because of the disagreeable consequences of disclosure. This inconvenience which he may suffer, in consequence of his testimony, by way of enmity or disgrace or ridicule or other disfavorable action of fellow members of the community, is also a contribution which he makes in payment of his duties to society in its function of executing justice. . . . When the course of justice requires the investigation of the truth, no man has any knowledge that is rightly private." 8 Wigmore, Evidence § 2192 at 72 (McNaughton rev. 1961) (footnote omitted).

See also, Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

---

responsibility—financial and perhaps moral —of all fathers. The theory of *Bell* and *Stanley* cannot avail the plaintiffs here. See

also, Vlandis v. Klein, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).

The only limitation on that power found in the Constitution is the fifth amendment's privilege against self-incrimination, which is that "no person . . . shall be compelled in any criminal case to be a witness against himself." This is in no way implicated here. We are not confronted with the problem of balancing the benefit to the state of the required information against the burden to the plaintiffs from the risks of self-incrimination as in California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). The competing interests at this level have been resolved in favor of the plaintiffs.

In related sections of the challenged statute, the state furnishes an immunity bath embracing "transactional" as well as "use" restrictions held sufficient in Kastigar v. United States, *supra,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212.[15] Indeed, the immunity granted extends to the putative father as well.[16] With the privilege not to be compelled to incriminate themselves completely safeguarded, all that could arguably support the plaintiffs' unwillingness to answer the particular inquiry authorized by the state would be simply a rule of evidence classified as an evidentiary privilege.[17]

The privilege asserted by the unwed mothers has its closest analogy to the marital privilege sometimes afforded to husband and wife.[18] But that privilege has no roots in the Constitution.

In Wyatt v. United States, 362 U.S. 525, 80 S.Ct. 901, 4 L.Ed.2d 931 (1960), the Court held that an objecting wife could be compelled to testify against her husband in a Mann Act prosecution notwithstanding her claim of marital privilege. The rationale for the denial of the privilege in that case was anchored in the legislative judgment underlying the Mann Act and not in the Constitution:

> "Applying the legislative judgment underlying the Act, we are led to hold it not an allowable choice for a prostituted witness-wife 'voluntarily' to decide to protect her husband by declining to testify against him." *Id.* at 530, 80 S.Ct. at 905 (Mr. Justice Harlan for the majority).

All of the Justices agreed upon the controlling principle:

> "That this decision is uniquely legislative and not judicial is demonstrated by the fact that, both in England and in this country, changes in the common-law privilege have been wrought primarily by legislatures." *Id.* at 535, 80 S.Ct. at 907 (dissenting opinion of Mr. Chief Justice Warren) (footnote omitted).

The real divergence of views which emerged concerned not the authority of the legislature to compel the testimony, but only over whether "prior congressional action provide[d] no support for the Court's decision," *id.* at 535, 80 S.Ct. at 907; there was no disagreement over

---

15. Public Act 439 § 2 (1971) amending Conn.Gen.Stats. § 52–435b. This section tracks the one set forth below in footnote 16 except that "mother" is substituted for "putative father."

16. Public Act 439 § 1 (1971), Conn.Gen. Stats. § 52–435c provides:
 "The putative father of any child for whom adjudication of paternity is sought in paternity proceedings shall not be excused from testifying because his evidence may tend to disgrace or incriminate him; nor shall he thereafter be prosecuted for any criminal act about which (1) he testifies in connection with such proceedings or (2) he makes any statement prior to such proceedings with respect to the issue of paternity."

17. We do not call the plaintiffs' alleged right not to testify a privilege in order to fit it into the now rejected "concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' " Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971), but only to signify the mere negative of the duty to testify.

18. For the history and policy of this somewhat questionable privilege see 8 Wigmore, Evidence §§ 2227, 2228 (McNaughton rev. 1961). See also, H.R.Rep.No.92–359, 92d Cong., 2d Sess., reported in 1972 U.S.Code Cong. & Admin.News at 836.

the basis of the authority on which the decision should rest. In both opinions, there was a complete absence of any indication of a link between a husband-wife privilege and a right which is "fundamental" in the sense that it is among the rights and liberties protected by the Constitution. Testimonial privileges arising out of confidential relationships are based on a legislative judgment that the need for preserving from exposure disclosures made in confidence outweighs the search for truth, but none of these has ever been considered as falling under the umbrella of constitutional protection. Cf. Branzburg v. Hayes, *supra*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626.

Furthermore, the privilege to withhold information asserted here concerns a relationship at least one step removed from that of husband and wife. Whatever merit there may be in the argument that a privilege in the wife not to testify against her husband preserves a marital relationship, the "policy of the privilege applies only to these who profess to maintain toward each other the legal relationship of husband and wife." 8 *Wigmore, Evidence*, § 2230 (Mc-Naughton rev. 1961).

The relationship which these unwed mothers seek to protect from disclosure is emphatically different. There is no privilege to withhold the testimony of a mere paramour or witness. *Id.* In the absence of any legal relationship the alleged "right" of these plaintiffs to refuse to answer the inquiries directed by the statute is devoid of any elements that comprise a jural interest.

### B. *The Extent of the Invasion*

 But even if we ignored the character of the relationship urged to merit such protection and equated it with the more durable one of legal husband and wife, the disclosure required of these plaintiffs would not invade any "zone of privacy." Viewed from the perspective of the class denied the privilege of remaining silent the "embarrassing" information has in large part been widely disclosed before any inquiries are made.[19] Furthermore, the inquiry focuses on identity of the father, not on the mother's misconduct. The question asked of the unwed mother is, "Who is the father of your child?" The object of the inquiry is to enforce a familial monetary obligation, not to interfere with personal privacy. There is no intrusion into the home nor any participation in interpersonal decisions among its occupants, even to the extent held permissible in Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971).[20] The statute does not forbid an unwed mother to have a man in the house or even in her bedroom. Compare King v. Smith, *supra*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118. The only restriction it imposes upon either the unwed mother or the biological father to do as they please or make any decisions they wish in whatever relationship they desire to maintain is that the father satisfy his legal obligation to support his

---

19. See Roe v. Wade, *supra*, 93 S.Ct. at 730, 35 L.Ed.2d at 180:
 "The pregnant woman cannot be isolated in her privacy. She carries an embryo and, later, a fetus . . . . The situation therefore is inherently different from marital intimacy, or bedroom possession of *obscene material*, or *marriage*, or *procreation*, or *education*, with which *Eisenstadt, Griswold, Stanley, Loving, Skinner, Pierce*, and *Meyer* were respectively concerned. . . . The woman's privacy is no longer sole and any right of privacy she possesses must be measured accordingly."

20. In Wyman v. James, a regulation mandating visits to the home of AFDC families by a caseworker at least once in every three months was upheld as reasonable to (1) serve the paramount needs of the dependent child; (2) to determine that state funds were being properly used; (3) as not unnecessarily intruding on the beneficiary's rights in her home; (4) as providing essential information not obtainable from secondary sources; and (5) as not being oriented toward a criminal investigation.

own child and that the mother provide what information she possesses useful toward that end.[21]

We conclude that the compulsion on the plaintiffs authorized by the statute does not impinge on any "fundamental" rights of the plaintiffs related to privacy.

We turn next to the contention of the plaintiffs that the statute violates their rights to equal protection of the laws.

## VI.

### Equal Protection

■ The Supreme Court has emphasized two distinct standards for testing claims of denial of equal protection. To determine which test applies, our initial inquiry is whether the statute

"[1] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implic-

itly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If not, [2] the [Connecticut] scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16, 33 (1973)[22]

■ Since the nature of the "rights" asserted by the plaintiffs are not in any sense "fundamental," the plaintiffs offer an alternative argument for subjecting the statute to "strict judicial scrutiny." This we also hold to be inapplicable.

We do not quarrel with the view that a discriminatory classification based

21. Our attention was called to the case of one mother of a child born out of wedlock who, although qualified to receive AFDC welfare benefits, refused to apply for them rather than disclose the name of her child's father. An argument against the home visitation regulation in Wyman v. James, *supra*, 400 U.S. at 324, 91 S.Ct. at 389, based on hypothetically similar circumstances was rejected:

"So here Mrs. James has the 'right' to refuse the home visit, but a consequence in the form of cessation of aid . . . flows from that refusal. The choice is entirely hers, and nothing of constitutional magnitude is involved."

22. Until fairly recently, few would take any exception to this capsule summary of what has come to be referred to as the two-tiered standard of equal protection; the first requiring "strict judicial scrutiny," and the second requiring only some rational relationship to a legitimate state purpose. There is little doubt that this once-settled differentiation is currently being critically re-examined, particularly in this circuit, for symptoms of what Chief Judge Kaufman described in City of New York v. Richardson, 473 F.2d 923, 931 (2d Cir.), cert. denied sub nom. Lavine v. Lindsay, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973), as the giving way of the two-tiered equal protection standards "to a more graduated sliding-scale test." See generally, Gunther, The Supreme Court,

1971 Term, Forward, In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). See also, Boraas v. Village of Belle Terre, 476 F.2d 806 (2d Cir. 1973) ; Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1973). It may be still unclear whether any set of new standards has been adopted, a situation which Judge Timbers believes is unsatisfactory. See Boraas v. Village of Belle Terre, *supra*, 476 F.2d at 826 (dissenting from 4–4 denial of en banc reconsideration). Judge Newman in Henry v. White, 359 F.Supp. 969 (D.Conn.1973), citing to San Antonio Independent School Dist. v. Rodriguez, *supra*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, and McGinnis v. Royster, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282, 288–289 (1973), observed that "more recent cases suggest that the rational relationship test is alive and well."

The factual situation presented in this case warrants no grand exegesis of where the law of equal protection is headed. It will suffice to note that to the extent that the "legitimate articulated state purpose" referred to by Mr. Justice Powell in *Rodriguez*, *supra*, 411 U.S. at 16, 93 S.Ct. at 1287 36 L.Ed.2d at 33, and in *McGinnis*, *supra*, 410 U.S. at 270, 93 S.Ct. at 1059, 35 L.Ed.2d at 289, may be construed to establish a degree of rationality more akin to that in *Boraas*, *supra*, 476 F.2d 806, than to the "minimum rationality" of the older standard we adopt it for use in this case.

upon illegitimacy of children ought to be inherently suspect.[23] But the plaintiffs' contention that the statute must be subjected to strict judicial scrutiny on the ground that it adversely affects a suspect class amounts to no less than standing the doctrine on its head. Instead of operating to the disadvantage of children born out of wedlock the statute operates to their benefit.[24] The statute imposes no additional burden upon them. To the contrary, the statute under consideration operates prophylactically against the adverse differential treatment which the unwed mothers would impose on their children. Indeed, if the legislature were to enact a law protecting the "right" of unwed mothers to exclude their children from the benefit of paternal support, it would be struck down. In Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56, 60 (1973), the Court declared:

"We therefore hold that once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because her natural father has not married her mother. For a State to do so is 'illogical and unjust.' Weber v. Aetna Casualty & Surety Co., supra, at 175 [of 406 U.S., at 875 of 93 S.Ct.]."[25]

The effect of the statute is consistent with the trend of the law to separate the label "illegitimate" from the word "child" to prevent the exclusion of children of unwed mothers from benefits available to other children. One of the reasons for denying the plaintiffs' application for a temporary injunction against enforcement of the statute was that hardships would fall more heavily on the children than on their mothers.[26]

23. "Status of birth, like the color of one's skin is something which the indiviual cannot control, and should generally be irrelevant in legislative considerations. Yet illegitimacy has long been stigmatized by our society. Hence, discrimination on the basis of birth—particularly when it affects innocent children—warrants special judicial consideration." San Antonio Independent School Dist. v. Rodriguez, supra, 411 U.S. at 109, 93 S.Ct. at 1335, 36 L. Ed.2d at 87 (dissent of Marshall, J.).
See also, Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

24. At this point, the interests of the unwed mothers and those of their children part company. In Wyman v. James, supra, 400 U.S. at 318, 91 S.Ct. at 386, this discrimination between the interests of the unwed mother and her child was emphasized by Mr. Justice Blackmun:
"There are a number of factors that compel us to conclude that the home visit proposed for Mrs. James is not unreasonable: "1. The public's interest in this particular segment of the area of assistance to the unfortunate is protection and aid for the dependent child whose family requires such aid for that child. The focus is on the child and, further, it is on the child who is dependent. There is no more worthy object of the public's concern. The dependent child's needs are paramount, and only with hesitancy would we relegate

those needs, in the scale of comparative values, to a position secondary to what the mother claims as her rights."

25. It has long been the policy of Connecticut to require a father to support his illegitimate child. State v. Wolfe, 156 Conn. 199, 203, 239 A.2d 509 (1964); see also, Franklin v. Congelosi, 6 Conn.Cir. 357, 273 A.2d 291 (1970). And if there is any universal moral law it is that parents must nurture and support their young children; this is a duty that belongs to a man as a man, and not simply as a member of a civil society.

26. Insofar as the operation of the statute strikes down a discrimination against the plaintiff children as illegitimates it should receive favorable judicial consideration rather than "strict scrutiny." Weber v. Aetna Cas. & Sur. Co., supra, 406 U.S. at 176, 92 S.Ct. 1400. During the course of recent intensive analysis of equal protection standards the Supreme Court has consistently held that legislative discrimination to the disadvantage of children because of their out-of-wedlock birth could be justified only by a showing that the state interest furthered by the statute was "substantial." Id. at 170, 92 S.Ct. 1400; Gomez v. Perez, supra, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56; Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); Glona v. American Guarantee & Liab. Ins. Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968); Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1917, 28 L.Ed.2d 288 (1971); and see

See Doe v. Norton, *supra*, 356 F.Supp. 202.

The statute at issue involves neither discrimination against a "suspect" classification nor impinges upon a "fundamental" interest so as to require the application of the "strict scrutiny" test. We turn, therefore, to the less stringent test of equal protection which is whether the statute "rationally furthers some legitimate articulated state purpose."

### A. *Governmental Interest*

The plaintiffs urge upon us the test of equal protection adopted in Boraas v. Village of Belle Terre, *supra*, 476 F.2d 806, and formulated in Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S. Ct. 560, 561, 64 L.Ed. 989 (1920):

> "The classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."

■ Since the reasonableness of the classification should be considered in relation to the object of the statute, we begin by first identifying the purpose of the statute.[27] Although one of the important by-products of the operation of the statute is the long term benefit it secures to the children by the early establishment of their paternity, see Doe v. Norton, *supra*, 356 F.Supp. 202, its primary purpose is to enforce the obligation of a father to support his own child. There is no need to theorize. The face of the statute furnishes sufficient reliable guidance to its purpose, especially when read together with the complementary sections of the Social Se-

curity Act, as elaborated above in Part IV. Cf. Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). Consequently, we have no occasion to resort to that more embrasive standard of equal protection which permits a purpose to be found from "any state of facts which may be reasonably conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), quoted with approval in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The defendant public official, who administers the laws under which welfare assistance is given to these plaintiffs, is not only authorized, but required, to proceed under the statute in order to establish the primary obligation of the father to support his child as one of the "resources" which the state is entitled to consider in ascertaining the plaintiffs' eligibility for AFDC benefits. See 42 U.S.C. § 602(a)(7). Indeed, welfare beneficiaries may be required to assign any property they may have, or which they might in the future obtain, as security for repayment of the benefits they receive from the state under its welfare laws. See Snell v. Wyman, *supra*, 281 F.Supp. 853 (S.D.N.Y.1968); Charleston v. Wohlgemuth, 332 F.Supp. 1175 (E.D.Pa.1971), aff'd without opinion, 405 U.S. 970, 92 S.Ct. 1204, 31 L. Ed.2d 246 (1972).

### B. *The Classification*

■ The plaintiff mothers assert a right to be free from a discriminatory classification based on the fact that they are unwed mothers who receive public assistance. While shaping their claim in that form may appear to present some abstract inequality to complain about,

---

Davis v. Richardson, 342 F.Supp. 588 (D. Conn.), aff'd, 409 U.S. 1069, 93 S.Ct. 678, 34 L.Ed.2d 659 (1972).

27. The purpose need not have been a main objective of the statute or even one the legislature had in mind. Flemming v. Nestor, 363 U.S. 603, 612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

"(O)ur decisions do not authorize courts to pick and choose among legitimate legislative aims to determine which is primary and which subordinate. . . . So long as the state purpose upholding a statutory class is legitimate and nonillusory, its lack of primacy is not disqualifying." McGinnis v. Royster, *supra*, 410 U. S. at 276, 93 S.Ct. at 1062, 35 L.Ed.2d at 292.

that is accomplished only at the cost of leaving something out. This statute which imposes a duty upon an unwed mother to disclose the name of the putative father of her child does *not* distinguish between unwed mothers who receive public assistance and those who do not. The statute permits the compelled disclosure of the name of the father from any mother of an illegitimate child, viz: "to the welfare commissioner, if such child is a recipient of public assistance, or to a selectman of a town in which such child resides, if such child is a recipient of general assistance, or *otherwise* to a guardian or a guardian ad litem of such child. . . ."[28] (Emphasis added).

 In an attempt to bolster their argument, the plaintiffs suggest that it is unrealistic to expect any guardian appointed by the probate court to resort to the statute and that such a guardian would normally support the child himself. They also suggest that it is questionable if one whose parental rights are terminated pursuant to such an appointment would still have a legal duty to support the child. No support is offered for either argument and we reject both. That displacing a natural father as the guardian of the person or of the estate of his minor child does not eliminate his obligation to continue to provide for its support is too settled to merit discussion. There are thousands of valid child support decrees against fathers who do not have custody of either the person or estate of their children.

If we were to accept the assumption of the plaintiffs that because of the division of authority among different persons to initiate proceedings under the statute proportionately fewer such proceedings would be brought by guardians or guardians ad litem than by the commissioner, this would not render the classification offensive to the equal protection clause.[29] As Judge Frankel stated in Snell v. Wyman, *supra*, 281 F. Supp. at 865:

"Like the life of the law generally, the Fourteenth Amendment was not designed as an exercise in logic. It is ancient learning by now that a classification meets the equal protection test 'if it is practical and is not reviewable unless palpably arbitrary.' Orient Insurance Co. v. Daggs, 172 U. S. 557, 562, 19 S.Ct. 281, 282, 43 L.Ed. 552 (1869). If the classification has 'some reasonable basis,' it cannot be held offensive to the Equal Protection Clause 'because it is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). 'The problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific.' Metropolis Theater Co. v. City of Chicago, 228

---

28. The statute also applies to "the mother of any child born to any married woman during marriage which child shall be found not to be issue of the marriage terminated by a divorce decree or by decree of any court of competent jurisdiction."

29. Perhaps the benefits which the statute authorizes for all illegitimate children and their mothers may not be sought after as assiduously by others legally responsible for the estates of the children. But there is no basis for assuming that the legislature intended arbitrarily to leave one class of illegitimate children without meaningful protection. The statute makes available in their behalf the same remedies that are enforceable by a welfare commissioner or a town selectman who has provided general assistance for needy families containing illegitimate children. Because the state may not be able to bring the benefits of the statute to all, it is not precluded from benefiting some.

"The law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow." Buck v. Bell, 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1927) (Holmes, J.).

It is not a basis for any complaint by the plaintiffs that the benefits extended to them are not extended to others similarly situated. See Katzenbach v. Morgan, 384 U.S. 641, 656–657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)."

### C. *The Rational Relationship*

 Even if, as the plaintiffs argue, the statute ought logically to be construed to create a separate classification affecting only unwed mothers of illegitimate children who receive some form of public assistance,[30] that particular classification is directly linked to the public interest the statute is designed to secure. In the case of these plaintiffs, it is the state, not a private party, which furnishes to the plaintiffs and their children welfare assistance in accordance with their needs. Because the state provides those benefits, it is "rational" that it should take steps to enforce the prior obligation of their fathers to provide that support. It is not disputed that the only source of information about the identity of the fathers of these children is the knowledge possessed by their unwed mothers. The classification is reasonable rather than "arbitrary or capricious" because it bears a rational relationship to a legitimate state purpose. Weber v. Aetna Cas. & Sur. Co., *supra*, 406 U.S. at 172, 92 S.Ct. 1400.

### D. *The Interests Adversely Affected*

 Since there is no basis for objection to the principle that parental responsibility should be enforceable, the argument shifts to one about means rather than ends. The plaintiff mothers contend that the sanctions which Connecticut permits its courts to impose upon uncooperative unwed mothers are impermissible under the Act. The plaintiffs argue that less important than the detection of the father to enforce his obligation are the consequences to the

mother and child of the detection process. There is undoubted power of the government "to compel persons to testify in court or before grand juries and other governmental agencies . . . ." Kastigar v. United States, *supra*, 406 U.S. at 443, 92 S.Ct. at 1655. While any imprisonment, of course, has punitive and deterrent effects, it is clear that the character and purpose of any imprisonment meted out under this statute would be for refusal to testify.

The proceeding under the statute is a civil, rather than a criminal one.[31] As the Court held in Shillitani v. United States, 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966), the sentence must be viewed not as punishment for violation of state criminal laws but as " 'essentially a civil remedy designed for the benefit of other parties and [one which] has quite properly been exercised for centuries to secure compliance with judicial decrees.' Green v. United States, 356 U.S. 165, 197 [78 S.Ct. 632, 650, 2 L.Ed.2d 672], (1958) (Black, J., dissenting)."

"[I]t is beyond dispute that there is in fact a public obligation to provide evidence, see United States v. Bryan, 339 U.S. 323, 331 [70 S.Ct. 724, 730, 94 L.Ed. 884]; Blackmer v. United States, 284 U.S. 421, 438 [52 S.Ct. 252, 255, 76 L.Ed. 375], and that this obligation persists no matter how financially burdensome it may be." Hurtado v. United States, 410 U.S. 578, 589, 93 S.Ct. 1157, 1164, 35 L.Ed.2d 508, 518 (1973) (footnote omitted).

Furthermore, unlike the plaintiff class in *Hurtado*, who were held to be kept justifiably incarcerated as material witnesses until the commencement of the

---

30. "There is hardly a law on the books that does not affect some people differently from others. But the basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes. And with respect to such legislation, it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory

—only by classifications that are wholly arbitrary or capricious. See, e. g., Rinaldi v. Yeager, 384 U.S. 305 [86 S.Ct. 1497, 16 L.Ed.2d 577] . . . ." San Antonio School Dist. v. Rodriguez, *supra*, 411 U.S. at 60, 93 S.Ct. at 1310, 36 L.Ed.2d at 58 (Stewart, J., concurring) (footnote omitted).

31. The parties agreed to this by stipulation.

trial at which they were to testify, these plaintiffs "carry 'the keys of their prison in their own pockets,' In re Nevitt, 117 F. 448, 461 (C.A. 8th Cir. 1902) . . . . In short, if the petitioners had chosen to obey the order they would not have faced jail." Shillitani v. United States, *supra*, 384 U.S. at 368, 86 S. Ct. at 1534. Cf. S. v. D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536, 541 (1973).

The choice of means may be regarded by some as harsh, but "[i]t is not for us to evaluate the wisdom of the state's choice of means. If these means are rationally related to a proper end, as they are in this case, we have no power to go further." Hagans v. Wyman, 471 F.2d 347, 350 (2d Cir. 1973).

The incarceration of an unwed mother for contempt, or for any other unlawful behavior, may work to the disadvantage of her child. Yet no one would be heard to argue that motherhood per se provides an absolute defense to the imposition of undesired but otherwise lawful sanctions simply because that mother's child might suffer from the separation resulting from her incarceration.

■■■ That the method adopted by Connecticut's legislature is entirely permissible has been suggested in Cooper v. Laupheimer, 316 F.Supp. 264, 270 (E.D. Pa.1970), where the court in reasoned dictum stated:

"Pennsylvania has at its disposal methods, consistent with the Social Security Act, by which it can recover excess payments. It may institute criminal prosecution against a recipient who has fraudulently obtained a duplicate payment and, upon conviction, obtain restitution, a fine and/or imprisonment. It may also file a civil action, obtain a judgment, and satisfy the judgment when the recipient is able to pay. The state may not, however, seek to protect its interests by a method which violates the Act when it has available other legitimate means." [32]

Throughout this case, the plaintiffs have argued as if the touchstone of our inquiry was whether the expected advantages to the state from the statute were outweighed by the harmful effects to the families affected by its enforcement. But even if the task of balancing these competing values was for the judiciary, rather than for the legislature, we would not find any basis for depriving the state of this traditional method of compelling witnesses to give answers to the inquiries under the statute. In holding that the policy favoring the right of the state to have every person's testimony may be enforced by imprisoning the witness who refuses to answer, the Court has recently held that there is no exception for one who is reluctant to testify, either for his own behalf or to shield another because of the adverse effect which such testimony might have on his future relationship with the person who is the object of the inquiry. See Branzburg v. Hayes, *supra*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626. The exposure of the plaintiffs in this case to imprisonment for contempt does not constitute an unacceptable sacrifice of competing policy interests nor contravene the Act.

To sum up our analysis of the plaintiffs' equal protection claim—we decide that the challenged statute does not suffer any constitutional infirmity under the equal protection clause because after consideration "of the nature of the unequal classification under attack, the nature of the rights adversely affected,

---

32. In Cooper v. Laupheimer, the court ruled that Pensylvania's attempt to adjust past overpayments of AFDC assistance by recoupment from subsequent grants was inconsistent with the statutory requirement that AFDC benefits be furnished to all eligible individuals with reasonable promptness. For a later case in this circuit holding that a rent payment, advanced to avoid eviction of AFDC recipients who had spent the portion of their grant designated for shelter for some other purpose, could be recouped out of later grants without denying equal protection nor conflicting with the Act, see Hagans v. Wyman, *supra*, 471 F.2d 347.

and the governmental interest urged in support of it," the statute has "a substantial relationship to a lawful objective." Boraas v. Village of Belle Terre, *supra*, 476 F.2d at 814. What the Court said in Dandridge v. Williams, *supra*, 397 U.S. at 487, 90 S.Ct. at 1162, and requoted for emphasis in Jefferson v. Hackney, 406 U.S. 535, 551, 92 S.Ct. 1724, 1734, 32 L.Ed.2d 285 (1972), is pertinent here:

> "We do not decide today that the [state law] is wise, that it best fulfills the relevant social and economic objectives that [the state] might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. . . . [T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients."

### Conclusion

We, therefore, conclude that the statute in issue does not conflict with any provision of the Social Security Act; that it rationally furthers a legitimate articulated state purpose in establishing the paternity of children born out of wedlock and securing support for them; that it does not invidiously discriminate against any of the plaintiffs in violation of the equal protection clause of the fourteenth amendment; that its operation does not constitute an unwarranted invasion of privacy; and that it violates no rights guaranteed by the Constitution.

The application for a permanent injunction is denied, and the case is dismissed.

So ordered.

NEWMAN, District Judge (concurring):

I agree with the Court that Conn. Gen.Stat. § 52–440b is not unconstitutional on its face, but I believe there is an additional constitutional question that will have to be considered when the statute is applied to specific individuals. This concerns the extent of protection afforded by the constitutional right of privacy.

The Court's opinion considers and rejects primarily the Fifth Amendment and testimonial privileges as possible barriers to a mother's enforced disclosure of the identity of an illegitimate child's father. I agree with those conclusions and with the Court's further observation that the statute on its face does not invade any constitutionally protected zone of privacy. The statute's facial validity in this regard is properly upheld in the precise sense that not every application of the statute would achieve an unconstitutional result. But without anticipating all of the situations that will arise in the implementation of this statute, I think it is important to point out that a constitutionally protected right of privacy will be implicated and may well prevail against the statute's enforcement in some situations.

There can be no question that liberty, within the meaning of the Fourteenth Amendment, includes privacy with respect to some aspects of family life and sexual intimacy. Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Chief Justice has only recently observed that the "Constitution . . . protects . . . special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education." United States v. Orito, 413 U.S. 139, 142, 93 S.Ct. 2674, 2677, 37 L. Ed.2d 513 (1973). In its application, this statute will involve privacy rights

concerning both procreation and child rearing. The latter is evident. It is certainly an important aspect of child rearing for a mother to decide whether to secure legally some actual or potential financial benefit for her child at the expense of fracturing an amicable father-child relationship or even of harming the child by inflicting upon it distressing knowledge such as incestuous parentage. Decisions on such matters would plainly seem to enjoy no less constitutional protection than the decision whether to educate the child at a public or private school. *Cf.* Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). The relationship between non-disclosure of the father's name and privacy concerning procreation requires brief elaboration.

Unlike *Roe*, where the plaintiff wanted to have an abortion, and *Griswold*, where the plaintiff wanted to use a contraceptive, these plaintiffs do not claim a right to do something but to maintain secrecy concerning what they have done. More precisely, each plaintiff asserts the right to maintain secrecy concerning the identity of the man with whom she was intimate.[1] In the First Amendment context, the Supreme Court has recognized that some aspects of constitutionally protected conduct may be shielded from state-compelled disclosure concerning such conduct. Thus the right of N.A.A.C.P. members to join together to advance their purposes carried with it a right to maintain secrecy concerning the

identity of the members as against Alabama's interest in enforcing its corporate regulations. N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L. Ed.2d 1488 (1958). See also Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). Since privacy is the central concept underlying constitutionally protected rights pertaining to sexual matters, Griswold v. Connecticut, *supra,* it seems obvious that such rights carry with them concomitant rights to maintain secrecy concerning sexual intimacies. It is true, as the Court observes, that the inquiry of the challenged statute focuses on the father's identity, but the mother cannot respond to the inquiry without disclosing a very private fact—the name of the person with whom she had sexual relations.

Whether related to privacy concerning child rearing or procreation, recognition of some constitutional protection surrounding the identity of one's sexual partner does not end, but only begins the pertinent inquiry, namely—whether the state has shown sufficient justification to override the protected interest. Unlike the constitutional privilege against self-incrimination, the privacy protection of the Fourteenth Amendment is subject to the legitimate and substantial concerns of the state. See N.A.A.C.P. v. Alabama, *supra.* The Court identifies as the primary purpose of § 52–440b the enforcement of a father's obligation to support his child.[2]

1. The Court properly observes that, wholly apart from the state-compelled inquiry, the fact of the mother's pregnancy has no doubt been disclosed to some extent. But simply because the fact of pregnancy and subsequent birth is known, either widely or narrowly, in the case of mothers who not infrequently give birth to illegitimate children far removed from their communities, all rights to privacy concerning the identity of the paramour do not automatically disappear.

2. In this connection, I agree with the Court that in considering plaintiffs' equal protection claim, *i. e.,* whether this legislative purpose is rationally advanced by the legislative classification, the statute should be

viewed as creating a classification of mothers of illegitimate children who receive welfare. Though the statute purports to require disclosure of the father's identity not only to the welfare commissioner in the case of welfare beneficiaries, but also to guardians and guardians *ad litem,* I disagree with the Court's alternative contention that the statute thereby applies to all mothers of illegitimate children. Plainly the statute does not in terms specify that all mothers of illegitimate children must disclose the father's identity. Instead it specifies three officials empowered to compel disclosure. The statute would be comprehensive only if all illegitimate children whose mothers are not receiving welfare had guardians or guardians

In some circumstances achieving that purpose may well be sufficient to justify impairment of the mother's right to privacy. A strong case would be presented if the father's identity is ascertainable and the three-year statute of limitations for paternity actions, § 52–435a, has not run. On the other hand, there may well be situations where the prospect of enforcing the father's support obligation is so insubstantial that the statutory purpose cannot constitutionally override the mother's privacy right. If, for example, the statute of limitations for paternity actions has run, it is difficult to see what legitimate interest is served by enforced disclosure. There may also be situations where the mother has disclosed the father's identity but is reluctant to strain family relationships by bringing a paternity action. Since the welfare commissioner has authority to prosecute the paternity suit, the state's interest in compelling the mother to sue might well be insufficient to justify impairment of the constitutionally protected interest she has in making decisions

to maintain the harmony of her family unit. See Haley v. Troy, 338 F.Supp. 794, 804 (D.Mass.1972).

We need not decide how the constitutional balance should be struck in the variety of factual situations that will come before the state circuit court judges charged with the responsibility for adjudicating contempt citations under this statute. The Court recognizes in footnote 14 of Chief Judge Blumenfeld's opinion that the statute accords the state judges ample discretion to determine the appropriateness of contempt remedies in specific cases. I simply wish to make clear that in exercising their discretion the state judges will have to adjudicate the Fourteenth Amendment question of whether the state interest sought to be advanced outweighs the mother's constitutionally protected interest in privacy in sexual and child rearing matters,[3] and they may well be obligated to conclude that application of the statute in some circumstances would be unconstitutional.[4]

---

*ad litem* appointed for them. Guardians *ad litem* appear on the scene only with respect to certain kinds of litigation, and guardians are designated by the probate court principally in the event of a finding of the mother's abandonment or neglect. Conn. Gen.Stat. § 45–43. Sec. 45–43 also provides for appointment of a guardian where the probate court finds that removal of the parent as guardian is "for the best interests of the child," but the state has not called our attention to any instance where probate court has construed the statute as permitting the mother's failure to bring a paternity action to be sufficient justification for removing her as guardian.

3. In some instances privacy rights of the child might be implicated that are not identical with the mother's, in which case a guardian *ad litem* might be needed to be sure the

constitutional issue is properly developed for decision.

4. Procedural problems may well be encountered in developing a record to determine whether in a particular case the substantiality of the state's interest in enforcing the father's obligation outweighs the mother's privacy interest. In some cases it may be difficult to assess the state interest unless the identity of the father is known. Perhaps *in camera* proceedings can be employed in such instances. Sometimes it may be possible to persuade the trier of fact that the paternity suit statute of limitations has run without any disclosure of the father's name, as where third party testimony demonstrates that the father (or any male) has contributed no support for more than three years.