Donna DOE et al., Individually and on behalf of all others similarly situated

v.

Edward MAHER, Individually and as Commissioner of Social Services of the State of Connecticut.

Sharon ROE et al., Individually and on behalf of all others similarly situated

v.

Edward MAHER, Individually and as Commissioner of Social Services of the State of Connecticut.

Civ. Nos. 15579, 15589.

United States District Court, D. Connecticut.

June 1, 1976.

David N. Rosen, Rosen & Dolan, Edward J. Dolan, New Haven, Conn., Frank Cochran, Conn. Civil Liberties Union Founda-

tion, Inc., Hartford, Conn., Stephen Wizner, New Haven, for plaintiffs.

Michael Anthony Arcari, Asst. Atty. Gen., Hartford, Conn., for defendant.

Before TIMBERS, Circuit Judge, and BLUMENFELD and NEWMAN, District Judges.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge:

An earlier decision in this action [1] was appealed to the Supreme Court, which noted probable jurisdiction, 415 U.S. 912, 94 S.Ct. 1406, 39 L.Ed.2d 466 (1974). Thereafter the Court vacated the judgment and remanded the case to this court

"for further consideration in light of Pub.L. 93–647, and, if a relevant state

criminal proceeding is pending, also for further consideration in light of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975)."

*Roe v. Norton,* 422 U.S. 391, 393, 95 S.Ct. 2221, 2222, 45 L.Ed.2d 268 (1975).

 In our original opinion, we upheld the constitutionality of Conn.Gen.Stat.Ann. § 52–440b (1976 Supp.) [2] against claims that it denied due process and equal protection, invaded the plaintiffs' rights to privacy and conflicted with the purposes of the Social Security Act. Upon remand, this court has received briefs and heard arguments on all the issues to aid it in its further consideration of the case. [3]

We have been instructed to reconsider two different aspects of federalism, absten-

1. This opinion assumes knowledge of our original opinion, *Doe v. Norton,* 365 F.Supp. 65 (D.Conn.1973); several issues discussed in that decision will not be repeated here. The present Commissioner of Social Services, Edward Maher, has been substituted as a defendant pursuant to Rule 25(d)(1), Fed.R.Civ.P.

2. Conn.Gen.Stat.Ann. § 52–440b (1976 Supp.) reads:

"(a) If the mother of any child born out of wedlock, or the mother of any child born to any married woman during marriage which child shall be found not to be issue of the marriage terminated by a *decree of divorce or dissolution* or by decree of any court of competent jurisdiction, fails or refuses to disclose the name of the putative father of such child under oath to the welfare commissioner, if such child is a recipient of public assistance, or to a selectman of a town in which such child resides, if such child is a recipient of general assistance, or otherwise to a guardian or a guardian ad litem of such child, such mother may be cited to appear before any judge of the *court of common pleas* [assigned to a geographical area] and compelled to disclose the name of the putative father under oath and to institute an action to establish the paternity of said child.

"(b) Any woman who, having been cited to appear before a judge of the *court of common pleas* pursuant to subsection (a), fails to appear or fails to disclose or fails to prosecute a paternity action may be found to be in contempt of said court and may be fined not more than two hundred dollars or imprisoned not more than one year or both."

The bracketed material was added when the statute was amended in 1975. P.A. No. 75–406, § 6. The italicized material was substituted for "divorce decree" and "circuit court" respectively in 1974. P.A. No. 74–183, § 110. The merger of the circuit courts into the courts of common pleas is discussed at note 12 *infra.*

3. We have also taken two further procedural steps. First, the original class determination is modified to include three sub-classes. The first sub-class consists of all persons against whom contempt actions under § 52–440b are currently pending. The second sub-class consists of all persons against whom action under the statute has been threatened, or will be threatened in the future, but against whom no actions are presently pending. The third sub-class consists of the children of all persons in the first and second sub-classes. Rule 23(c)(1), (4), Fed.R. Civ.P.

Second, the motions of Hattie Hoe, Linda Robustelli, and Louis Parley, Esq., as guardian *ad litem* for the children of the named plaintiffs, to intervene in this action are granted. Rule 24(b), Fed.R.Civ.P. Ms. Hoe, against whom an action was commenced on June 30, 1975, is allowed to intervene to assure a named plaintiff in the first sub-class with a live and continuing controversy. *See Hagans v. Wyman,* 527 F.2d 1151, 1153 (2d Cir. 1975). Ms. Robustelli and Mr. Parley are allowed to intervene as the named representatives of the second and third sub-classes, respectively. We reaffirm our earlier finding as to the propriety of a class action and the ability of all the named plaintiffs, including the intervenors, to represent their respective sub-classes. Rule 23(b)(2), Fed.R.Civ.P.

tion and pre-emption. We turn first to the issue of abstention.[4]

### I. Abstention in Light of *Younger v. Harris*

The fact that the adult plaintiffs in this action, with the exception of the intervenor, Linda Robustelli, are defendants in pending contempt proceedings instituted by the Commissioner under the authority of § 52–440b (1976 Supp.), raises a serious issue of abstention in light of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971),[5] and its progeny. The intervention of Ms. Robustelli, who has been threatened with prosecution, but against whom no action is presently pending, cannot circumvent the issue, for while she may be entitled to declaratory and injunctive relief on a personal basis, *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), she cannot, under the guise of representing a class, dispense with the *Younger* considerations for those members of the class who are presently being prosecuted. "The requirements of *Younger* are not to be evaded by artificial niceties." *Allee v. Me-*

*drano,* 416 U.S. 802, 833, 94 S.Ct. 2191, 2209, 40 L.Ed.2d 566 (1974) (Burger, C. J., concurring in the result in part and dissenting in part). *Cf. Allee v. Medrano,* 416 U.S. at 816 n. 10, 94 S.Ct. 2191. However, in the opinion of this court *Younger* does not prohibit the issuance of an injunction or declaratory relief in this action. This conclusion is founded upon a determination that neither of the considerations which support the *Younger* doctrine apply in the circumstances of this case, and, in addition, a finding that the plaintiffs lack a state forum in which they can adequately present their constitutional arguments. The latter is an essential prerequisite to abstention under the *Younger* doctrine.

### A. The Pending State Proceedings are not Criminal.

The first consideration which underlies the *Younger* abstention doctrine is the traditional reluctance of federal courts to interfere with pending state criminal prosecutions. *Younger,* 401 U.S. at 43, 91 S.Ct. 746; *Douglas v. City of Jeannette,* 319

---

4. The concurrence relies on the distinction articulated by Justice Harlan in *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), between ordering New York to conform its welfare program to federal statutory requirements and merely ordering that its federal funds be cut off unless it chooses to comply with those requirements, to avoid both the abstention and constitutional issues in this case. While we agree with Judge Newman's ripeness analysis as it affects plaintiff Linda Robustelli, against whom no contempt proceeding has commenced as yet, we disagree that it also obviates the necessity of ruling on the remaining plaintiff mothers' constitutional claims, or of confronting the *Younger* abstention problem.

 Plaintiffs Roe and Doe have been ordered to disclose the names of their children's fathers. They have refused to do so. Contempt proceedings have been instituted against them in state court, and are pending at the present time. They have sought an injunction halting those proceedings from this court, claiming that their constitutionally protected privacy interests are being infringed.

 Simply ordering the Commissioner to give up federal funding unless he complies with the Social Security Act would not halt the pending contempt cases. While we agree with Judge Newman regarding the Commissioner's likely

decision, that prediction cannot properly be the basis for a conclusion that these constitutional claims are not ripe for adjudication. These plaintiffs have taken affirmative steps in violation of the Connecticut statute they challenge. Thus, they are in a very different position than were the plaintiffs (except George Poole) in *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). And, unlike the plaintiffs in *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), they have a valid "claim of specific present objective harm [and] a threat of specific future harm." 408 U.S. at 14, 92 S.Ct.at 2326. There is no ripeness problem here. Accordingly, we must consider their constitutional claims, and the preliminary question of abstention to which the Supreme Court directed our attention.

5. The following actions are currently pending in Connecticut courts. This court has been informed that the State has voluntarily stayed the proceedings involving the named plaintiffs pending the outcome of this suit. No injunctions have been issued by this court. *White v. S. J.,* No. DN CV6–58218 (Ct. of Com.Pl., 6.A.6, New Haven Co.); *White v. V.P.,* No. DN CV6–58219 (Ct. of Com.Pl., 6.A.6, New Haven Co.); *Maher v. H.P.* (no Docket No.) (Ct. of Com.Pl., New Haven Co., June 30, 1975).

U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); *Fenner v. Boykin,* 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926). This consideration does not apply to the present case, however, because the pending state proceedings are in the nature of civil rather than criminal contempt.[6]

Under § 52–440b, it is the Commissioner of Social Services, not a district attorney, who has a woman who refuses to cooperate with the Department of Social Services cited to appear before a judge of the court of common pleas. This factor alone has been held to distinguish civil from criminal contempt in this circuit. *In re Kahn,* 204 F. 581 (2d Cir. 1913). And *see In re Guzzardi,* 74 F.2d 671 (2d Cir. 1935).

The more general tests established by the Supreme Court to distinguish between civil and criminal contempt, *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911); serve to strengthen the conclusion that contempt sentences administered under § 52–440b are primarily civil, for their purpose would be to coerce testimony, rather than to vindicate the dignity of the court. *Compare Shillitani, with United States v. Seale,* 461 F.2d 345 (7th Cir. 1972). In order to constitute criminal contempt, the statute would have to be interpreted to require proof of an intent to obstruct justice and an imminent threat to the administration of justice. *In re Williams,* 509 F.2d 949 (2d Cir. 1975).

Connecticut law recognizes and applies this distinction. As the Connecticut Supreme Court has recently stated:

"In any event, in 1965 (prior to the commencement of the present proceedings), . . . the basic statute pursuant to which the previous proceedings were instituted was enacted as § 52–435a in chapter 911 entitled "Paternity Proceedings." No longer is there any reference in that section to quasi-criminal procedures such as arrest, pleas of guilty or not guilty, hearing on probable cause or binding over for trial. A plaintiff's paternity action has been stripped of any quasi-criminal characteristics and clearly converted to an unmistakable civil action."

*Robertson v. Apuzzo,* Conn., 37 Conn.L.J. No. 38; at 1, 4 (March 16, 1976).

These contempt proceedings are therefore not "more akin to [a] criminal prosecution[s]" than to civil actions and they are not "in aid of and closely related to criminal statutes." *Cf. Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975). And the nature of the proceeding is not converted to criminal simply because, under the statute in question, the State is suing in place of the parent. The stated purpose of § 52–440b is to allow the State to institute and successfully prosecute a paternity action and to recover support for the child. Rather than a criminal prosecution, the action is instead more in the nature of a civil debt collection.[7] The Welfare Commissioner is acting primarily as the guardian of the child, securing its rights, rather than as a criminal prosecutor or law enforcement officer "charged with the duty of prosecuting offenders against the laws of the state . . . [who] must decide when and how this is to be done."

---

**6.** Title 52 of the Conn.Gen.Stat.Ann. is entitled "Civil Actions." While this alone is not determinative, it is illustrative of the intent of the Connecticut legislature.

**7.** In discussing contempt proceedings for the closely related purpose of enforcing support orders, once paternity has been established, the Connecticut Supreme Court stated:

· "It is obvious that the contempt proceedings authorized by § 52–442 are remedial in purpose, designed to operate in a prospective manner and to coerce, rather than to punish, the contemnor to comply with the order of

the court. . . . The provisions for accomplishing execution of the court's money judgment and for contempt proceedings for failure to comply with the orders of the court do not convert the plaintiff's cause of action out of which the defendant's contempt of court arose from a civil to a criminal one." *Robertson v. Apuzzo,* Conn., 37 Conn.L.J. No. 38, at 1, 4 (March 16, 1976). Similarly, the fact that incarceration may be the sanction for non-compliance does not automatically make these proceedings criminal in nature. *Cf. Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976).

*Fenner v. Boykin,* 271 U.S. at 243–244, 46 S.Ct. at 493, *quoted* in *Younger,* 401 U.S. at 45, 91 S.Ct. 746. *But cf. Lynch v. Household Finance Corp.,* 405 U.S. 538, 556–61, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972) (White, J., dissenting).

If these contempt proceedings can be said to be "in aid of and closely related to" any particular statute, it is the federal Social Security Act, and not any particular criminal law of the State of Connecticut. In these circumstances, the element of *Younger* which rests upon the traditional reluctance of courts of equity to interfere with a criminal prosecution simply does not "mandate restraint." *Cf. Huffman,* 420 U.S. at 604, 95 S.Ct. 1200.

### B. *Federalism*

■ The comity considerations inherent in our federal system provide the second rationale for the *Younger* policy of abstention. *See Younger,* 401 U.S. at 44, 91 S.Ct. 746. As *Huffman* made clear, these considerations apply no less to an action because it is civil in nature rather than criminal. There, the Court stated that:

"Central to *Younger* was the recognition that ours is a system in which 'the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.' [*Younger,* 401 U.S. at 44, 91 S.Ct. 746]."

*Huffman,* 420 U.S. at 601, 95 S.Ct. at 1207. *See Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

However, given the nature of the plaintiffs' claims in this action, traditional notions of federal-state relations, rather than requiring abstention, impel this court to intervene, not only to protect the plaintiffs' constitutional rights, but also to enforce the

congressional intent underlying the recent amendments to the Social Security Act.

*Younger,* and the cases which follow it, involved, in essence, an attempt by a defendant in a pending state court proceeding to remove the action to federal court, without congressional authorization, based solely upon the dual claims that his constitutional rights had been or were being violated, and the expressed or unexpressed belief that federal courts were somehow more sympathetic to constitutional rights. These arguments were conclusively rejected in *Huffman:*

"... Art. VI of the United States Constitution declares that 'the Judges in every State shall be bound' by the Federal Constitution, laws, and treaties. Appellee is in truth urging us to base a rule on the assumption that state judges will not be faithful to their constitutional responsibilities. This we refuse to do."

420 U.S. 611, 95 S.Ct. 1211.

■ However, the challenges mounted by the plaintiffs in the present case are not exclusively substantive, constitutional ones. Consequently, the federalism issue must be viewed in a slightly different focus. Before this court can reach the plaintiffs' constitutional claims, it must first consider their claim that the state statute has been preempted by the recent amendments to the Social Security Act and the regulations to be promulgated thereunder. Although authority to invalidate a state law on preemption grounds is derived from the supremacy clause,[8] the test of the Connecticut statute's invalidity is whether it conflicts with federal legislation, not with a specific provision of the Constitution. The preemption doctrine, therefore, primarily involves the exercise of statutory interpretation, *i. e.,* the determination, in the absence of specific direction, of the congressional intent behind a specific statute or regulatory program. *Cf. Swift & Co. v. Wickham,* 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).[9]

8. *U.S.Const.* art. VI, clause 2.

9. Justice Harlan, in his opinion in *Swift,* concluded that an action for an injunction against a state statute on the ground of pre-emption did not require convocation of a three-judge

district court. He pointed out the distinction between the supremacy clause and the "substantive provisions" of the constitution, and reasoned that comity considerations were minimal in pre-emption cases. This position has

Federalism requires a different result in cases turning on the interpretation of federal statutes than it does in the cases presented in the *Younger* line of decisions. In addition to their special expertise in the interpretation of federal statutes, federal courts are more likely to give the proper emphasis to congressional intent and the necessary supremacy of federal law in the case of an actual conflict between federal and state legislation. Although all judges, state and federal, are sworn to uphold the federal laws and Constitution, state judges are not sworn to protect the legitimate interests of the national government at the expense of the legitimate interests of their own state sovereigns.

■ This is not to say that pre-emption is common, or that it is a doctrine which should be aggressively applied by federal courts. Nor is it to say that state courts are not capable of giving proper weight to the national interests underlying federal legislation. It is simply a recognition that considerations of federalism necessarily recognize an area of expertise in each of the two overlapping court systems. As the Supreme Court stated in *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 415–16, 84 S.Ct. 461, 465, 11 L.Ed.2d 440 (1964):

"Abstention is a judge-fashioned vehicle for according appropriate deference to the 'respective competence of the state and federal court systems.' *Louisiana P. & L. Co. v. Thibodaux,* 360 U.S. 25, 29 [79 S.Ct. 1070, 3 L.Ed.2d 1058]. Its recognition of the role of state courts as the final expositors of state law implies no disre-

gard for the primacy of the federal judiciary in deciding questions of federal law.* " [10]

■ This distinction, between plaintiffs' claims based on substantive constitutional grounds and those based on pre-emption, is especially important for yet another reason. An additional factor in *Younger* cases is the hesitancy of lower federal courts to interfere in an ongoing judicial proceeding under any circumstances. A finding of pre-emption, however, is a finding that the intrusion has already occurred. If this court were to conclude that the recent amendments to the Social Security Act pre-empted any application of § 52–440b, it would be a finding that for reasons of national policy Congress had intended that the pending state court actions should not have been instituted. It would be a finding concerning the validity of the proceeding itself, not just concerning the constitutionality of the particular statute or its particular application. While this would clearly be an intrusion into a legitimate sphere of state interest, it would be an intrusion accomplished at the direction of Congress, and one which is clearly within Congress' power to direct.

For these reasons we conclude that notions of federalism, the second consideration underlying the *Younger* doctrine, likewise do not compel us to refuse to intervene in this action.

C. *Availability of a State Forum*

■ Finally, there is an independent ground upon which abstention must be rejected. An essential prerequisite of absten-

recently been reaffirmed in *Moe v. Confederated Salish and Kootenai Tribes,* —— U.S. ——, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

* See Kurland, *Toward a Co-operative Judicial Federalism: The Federal Court Abstention Doctrine,* 24 F.R.D. 481, 487.

10. The recognition of the special expertise of the lower federal courts has been reaffirmed as recently as *Steffel v. Thompson,* 415 U.S. 452, 464, 94 S.Ct. 1209, 1218, 39 L.Ed.2d 505 (1974). In that decision the Court cited F. Frankfurter & J. Landis, *The Business of the Supreme Court* 65 (1928), and emphasized that:

"With this latter enactment [of the Judiciary Act of March 3, 1875], the lower federal courts 'ceased to be restricted tribunals of fair dealing between citizens of different states and became the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States.' " (Emphasis added in Supreme Court opinion.)

And *see Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

tion, *viz.* a forum in which the plaintiffs can present their constitutional claims, is not available under the special facts of this case.

In *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 1696, 36 L.Ed.2d 488 (1973), the Supreme Court stated:

> ". . . *Younger v. Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts. Such a course naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved."

And *see Huffman,* 420 U.S. at 594, 95 S.Ct. 1200.

Under the terms of § 52–440b, the Commissioner has the recalcitrant mother cited to appear before a judge of the court of common pleas. There she is ordered by the judge to testify and/or to institute a paternity action. If she refuses to do either she may be found in contempt of court. The statute contemplates a summary procedure, and does not appear on its face to allow the mother the right to challenge the authority of the Commissioner to institute the proceedings, the central issue in this case. The summary contempt procedure apparently intended by the statute, and as disclosed in the transcripts included in the record, does not appear to allow the mother an opportunity to fully litigate any defenses, much less complex constitutional and statutory issues. *Cf. New Haven Tenants' Representative Council, Inc. v. Housing Authority of City*

*of New Haven,* 390 F.Supp. 831 (D.Conn. 1975).

Furthermore, if we look beyond the theoretical concept of a court trial and consider the unique Connecticut philosophy, it appears that the court of common pleas might refuse to consider any constitutional challenge. In *State v. Muolo,* 119 Conn. 323, 326, 176 A. 401, 403 (1935), the Connecticut Supreme Court stated:

> "In the absence of constitutional or statutory prohibition, any court has power to pass on the constitutionality of a statute and it may be its duty to declare it invalid, but a proper regard for the great co-ordinate branch of our government, the legislative, and for the preservation of the respect of our citizens, who are apt to look askance upon a decision of a court so limited in its jurisdiction as the city court of New Haven holding invalid the considered legislative judgment, dictates that such a court should take such action only upon the clearest ground or where the rights of litigants make it imperative that it should do so. Otherwise it is better for such a court to leave the decision to our higher courts, to which the matter may be brought by appeal or otherwise."

While this may appear to leave room for a common pleas court to pass on constitutional issues and even to mandate that they do so in "imperative" cases, the doctrine has evolved to the point where the lower courts in Connecticut have refused to hear constitutional defenses in criminal prosecutions,[11] not to mention welfare cases.[12]

---

11. *See* Children's Exhibit "B" on Remand. This exhibit consists of three memorandum decisions refusing to deal with constitutional issues in criminal cases. In each case the circuit court (now the court of common pleas) relied on *State v. Muolo.*

12. *Helm v. Welfare Commissioner,* 32 Conn. Sup. 595, 600, 348 A.2d 317, 321 (Super.Ct. App.Sess.1975). On review of a circuit court decision, the three-judge panel held:

> "Initially the plaintiff assigned as error the court's failure to consider the plaintiff's constitutional claims. The court below did not err in holding that constitutional questions should be left to a court of higher jurisdic-

tion. *State of Muolo,* 119 Conn. 323, 326 [176 A. 401.]"

It may be noted that in 1974, Connecticut reorganized its judicial system so as to consolidate its civil courts into a unified system of courts of common pleas. 1974, P.A. No. 74–183. This new system became effective on December 31, 1974.

Although the decisions cited above all arose in the old circuit courts, there is no reason to believe that the new courts of common pleas will be any more willing to entertain constitutional arguments. Under the new system, the court of common pleas is, like its predecessor, a court of limited jurisdiction. Conn.Gen.Stat. Ann. § 52–6 (1976 Supp.) Appeals from its decisions are taken to the Appellate Session of

Since there is no guarantee that the plaintiffs would be able to raise their constitutional and statutory defenses in the pending state proceedings, which is the fundamental point on which abstention rests *Younger* does not prevent the intervention of this court at this stage to protect the plaintiffs' rights to litigate those issues.

Having decided, for the several reasons set forth above, that our exercise of jurisdiction over this case does not jeopardize federal-state relations within the sphere of judicial authority, we turn next to the question of whether, at the legislative level, the laws enacted by the Congress conflict with the Connecticut statute challenged in this case under the supremacy clause.

## II. Pre-emption

■ Preliminarily it should be noted that although this issue was considered in this court's earlier opinion,[13] the issue of pre-emption now comes before us in a somewhat different posture because of new federal laws enacted since that time. We must, therefore, consider this issue "in light of [the law] as it now stands, not as it once did." *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969).

In its mandate to this court, the Supreme Court noted:

". . . [S]ince that time Pub.L. 93–647, 88 Stat. 2337, was enacted. Pub.L. 93–647 amends § 402(a) of the Social Security Act to require parents, as a condition of eligibility for AFDC assistance, to cooperate with state efforts to locate and obtain support from absent parents but provides no punitive sanctions comparable to that provided by Conn.Gen.Stat. Rev. § 52–440b (1973)."

Section 402(a), 42 U.S.C.A. § 602(a) (1976 Supp.), has been amended once again since the Supreme Court's ruling by Pub.L. No. 94–88 § 208(a) (Aug. 9, 1975) so that, with

this most recent amendment shown in brackets, it now reads:

"§ 402(a):

"A state plan for aid and services to needy families with children must . . . .

"(26) provide that, as a condition of eligibility for aid, each applicant or recipient will be required—

". . .

"(B) to cooperate with the State (i) in establishing the paternity of a child born out of wedlock with respect to whom aid is claimed, and (ii) in obtaining support payments for such applicant and for a child with respect to whom such aid is claimed, or in obtaining any other payments or property due such applicant or such child [unless (in either case) such applicant or recipient is found to have good cause for refusing to cooperate as determined by the State agency in accordance with standards prescribed by the Secretary, which standards shall take into consideration the best interests of the child on whose behalf aid is claimed]; and that, if the relative with whom a child is living is found to be ineligible because of failure to comply with the requirements of subparagraphs (A) and (B) of this paragraph, any aid for which such child is eligible will be provided in the form of protective payments as described in section 406(b)(2) (without regard to subparagraphs (A) through (E) of such section);

"(27) provide, that the State has in effect a plan approved under part D and operate a child support program in conformity with such plan."

Whatever one may think of the wisdom of these new amendments, which now condition eligibility for welfare assistance on

---

the superior court, the trial court of general jurisdiction. § 52–6a (1976 Supp.)

*Helm v. Welfare Commissioner, supra,* involved an appeal from a circuit court, but taken under the new appellate procedure. In the

opinion, which upholds the continued validity of *State v. Muolo,* the court does not suggest that the demise of the circuit courts has in any way weakened the effect of the doctrine.

**13.** 365 F.Supp. at 70–73.

**1378**

cooperation in locating and obtaining support from absent parents and which require the State to set up a separate program to accomplish this result, it is readily apparent that Congress had strong views in favor of the enforcement of the parental obligations of fathers of children of unwed mothers.[14]

Many strands have been woven together (including incentives for both the family and the State) in the establishment of this new legislation designed to enforce the obligations of the absent parent. Indeed, the new provisions added to Title IV of the Social Security Act by Pub.L. No. 93–647 are so comprehensive that Congress established a new "Part D—*Child Support And Establishment Of Paternity*" to embrace them. Pub.L. No. 93–647 § 101 (Jan. 4, 1974), U.S.Code Cong. & Admin.News, 93d Cong., 2d Sess., Vol. 2, at 2716, 2732–43.[15] Detailed explication of all of them is not necessary for purposes of considering the pre-emption claim of the plaintiffs. In essence, the new amendments make an unwed mother who refuses to cooperate ineligible for benefits, a result which this court earlier held to be an illegal deprivation of benefits to her. *Cf. Doe v. Norton,* 365 F.Supp. at 71–72 and n. 8. To protect against an arbitrary denial of benefits, the new legislation specifically requires that the mother may not be found ineligible if she "is found to have good cause for refusing to cooperate," under standards that "shall take into consideration the best interests of the child on whose behalf aid is claimed." We turn now to consider whether the Connecticut legislation conflicts with the federal statute as so amended to such a degree that the state statute must be struck down.

The argument for pre-emption is that the application of the state's statute will obstruct the effectuation of the federal policy expressed in the above statutory provisions to such a degree that the state interests must yield. Viewing the new Part D from that perspective, it cannot be denied that Congress has adopted a very expansive program for establishing paternity and collecting support, one calling for the exercise of power on so many fronts that very little area is left open for state action.

But the existence of this broad area of mutuality of purpose of state and

14. In looking to the circumstances existing at the time the amendment was made, *see Moor v. County of Alameda,* 411 U.S. 693, 709, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), it may be noted that the intensive consideration given to the problem of securing parental support for the children of unwed mothers was not by any means accidental. Congress was aware of the fact that the number of AFDC recipients whose fathers were absent from the home had increased from 2.4 million persons in 1961 to 8.7 million by the end of June 1974. *See* legislative history of Pub.L. No. 93–647, 1974 U.S.Code Cong. & Admin.News, 93d Cong., 2d Sess., Vol. 4, at 8145–56.

15. Since Social Security was first enacted nearly 40 years ago, Congress has constantly revised it. In addition to the amendment of § 402(a) by Pub.L. No. 93–647 (Jan. 4, 1974), to provide that an unwed mother's eligibility should be conditioned on a certain amount of cooperation with State efforts to locate and obtain support from absent parents, of relevance also is new § 454, 42 U.S.C.A. § 654 (1976 Supp.), which in essence requires that a State plan must provide a single separate organizational unit (as the Secretary may by regulation prescribe) to undertake to establish paternity of a child born out of wedlock. § 454(4)(B). It also requires that the plan provide that "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services . . .." § 454(6)(A).

New § 457, 42 U.S.C.A. § 657 (1976 Supp.), deals with "Distribution of Proceeds;" it provides:

"(a) . . .

"(1) 40 per centum of the first $50 of [monthly support payments collected] shall be paid to the family without any decrease in the amount paid as assistance to such family during such month."

Sections 454(4)(A) and (B), 42 U.S.C.A. § 654(4)(A), (B) (1976 Supp.), which were to be parts of the State plan for child support, were further amended by Section 208(b) and (c) of Pub.L. No. 94–88 (Aug. 9, 1975), which qualified the state's duty to establish paternity and compel support. These actions are to be undertaken

". . . unless the agency administering the plan of the State determines in accordance with the standards prescribed by the Secretary pursuant to 602(a)(26)(B) of this title that it is against the best interests of the child to do so."

federal authority is insufficient to completely preclude state action. *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). Thus, the argument that § 52–440b is invalid because Congress has not chosen to require contempt proceedings against an uncooperative mother cannot be sustained. Congressional purpose to displace local laws must be clearly manifested. *H. P. Welch Co. v. New Hampshire,* 306 U.S. 79, 85, 59 S.Ct. 438, 83 L.Ed. 500 (1939). Where the federal statute has not expressly proscribed· certain action but has merely been silent there is no basis for an inference that Congress intended to forbid state supplementary action.

" . . . [T]he intent to supersede the exercise by the state of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the state. This principle has had abundant illustration." (Citations omitted.)

*Savage v. Jones,* 225 U.S. 501, 533, 32 S.Ct. 715, 726, 56 L.Ed. 1182 (1912). Nor does the identity of state and congressional purpose furnish a sufficient basis for a finding of congressional intent that the state should refrain from taking steps beyond those which Congress requires of it to achieve their mutual purpose. When a similar argument was presented in *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973), the Court responded:

"We do not agree. We reject, to begin with, the contention that pre-emption is to be inferred merely from the compre-

hensive character of the federal work incentive provisions. . . ." [16]

And *see DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).

In *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), Justice Black observed that in considering whether state laws were pre-empted by federal laws dealing with the same subject, the Court

"has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. . . ."

While none of these is an inappropriate description of pre-emption formulae in earlier cases, the difficulties which formerly attended a determination of pre-emption have been reduced.[17] There has been a shift from the multifarious theories that formerly underlay pre-emption to a much narrower field for judicial analysis.

■ While " . . . prior cases on pre-emption are not precise guidelines," *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973), the situation here is comparable to that in *Dublino* where the Court held that state work incentive programs in the administration of the AFDC program, which were complementary to those of HEW, were not pre-empted. In that case the crux of the test for pre-emption in the context of AFDC legislation is clearly set forth:

"In considering the question of possible conflict between the state and federal

16. The Court explained:

"The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem."
413 U.S. at 415, 93 S.Ct. at 2514.

17. For criticisms of the several pre-emptive standards in earlier cases, *see* Note, *Preemption as a Preferential Ground: A New Canon of Construction,* 12 Stan.L.Rev. 208 (1959); Selected Essays 1938–62, 310 (1963); and of the recent change in the Court's approach to pre-emption, *see* Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court,* 75 Colum.L.Rev. 623 (1975).

1380

work programs, the court below will take into account our prior decisions. Congress 'has given the States broad discretion,' as to the AFDC program, *Jefferson v. Hackney,* 406 U.S. 535, 545 [92 S.Ct. 1724, 32 L.Ed.2d 285] (1972); see also *Dandridge v. Williams,* 397 U.S. at 478 [90 S.Ct. 1153, 25 L.Ed.2d 491]; *King v. Smith,* 392 U.S. 309, 318–319 [88 S.Ct. 2128; 20 L.Ed.2d 1118] (1968), and '[s]o long as the State's actions are not in violation of any specific provision of the Constitution or the Social Security Act,' the courts may not void them. *Jefferson, supra,* at 541 [at 1729 of 92 S.Ct.] Conflicts, to merit judicial rather than co-operative federal-state resolution, should be of substance and not merely trivial or insubstantial. But if there is a conflict of substance as to eligibility provisions, the federal law of course must control. *King v. Smith, supra; Townsend v. Swank,* 404 U.S. 282 [92 S.Ct. 502, 30 L.Ed.2d 448] (1971); *Carleson v. Remillard,* 406 U.S. 598 [92 S.Ct. 1932, 32 L.Ed.2d 352] (1972)."

413 U.S. at 423 n. 29, 93 S.Ct. at 2518.[18]

The new amendments outlined above require that the eligibility of an unwed mother be determined solely under standards to be established by HEW, pursuant to the provisions of the Social Security Act. Close attention was paid by Congress to the interests of the children in requiring their unwed mothers to cooperate in establishing the parental obligations of their fathers. It is not until *after* a member of the plaintiff mothers' class is found not to have "good cause for refusing to cooperate," under "standards that take into consideration the best interests of the child on whose behalf aid is claimed," that the defendant Commissioner may resort to the ancillary remedy available under the state statute. Leaving this determination to state administration of an AFDC program is in accord with tradition; HEW has never had direct contact with applicants for assistance. In view of the establishment of such safeguards of the child's best interests, the state law, which comes into play only after the defendant Commissioner has complied with the provisions of the Social Security Act, can hardly be regarded as frustrating any part of the purpose of the federal legislation. On the contrary, it strengthens it.

Where the federal policy favoring disclosure of the name of the father is as strongly manifested as here, it stands logic on its head to argue that Connecticut's statute is in conflict with that policy.[19] Indeed, the whole of the new Part D would be nothing

18. In determining whether a substantial conflict exists between state and federal statutes, the court must construe both as narrowly as the language and legislative history permit. Only after first attempting to reconcile the statutes may the court find a conflict and thus avoid ruling on a substantive constitutional claim. Cf. *National Ass'n of Regulatory Util. Comm'rs v. Coleman,* 399 F.Supp. 1275, 1278 (M.D.Pa.1975).

19. It is clear that prior to the enactment of Pub.L. No. 94–88, HEW saw no conflict between the requirement in § 52–440b that the mother begin a paternity action, and the federal statute as amended by Pub.L. No. 93–647.

45 C.F.R. § 232.11 (1975), which deals with the duty of the applicant to assign any rights of support, states:

"(c) If there is a failure to execute an assignment pursuant to this section, the State may attempt to establish paternity and collect child support pursuant to appropriate State statutes and regulations."

Pub.L. No. 94–88 (August 9, 1975) deals with the duty to cooperate in obtaining support, a somewhat more onerous burden than simply assigning rights to support, but a duty which is also enforced in Connecticut under § 52–440b. Since we interpret this amendment to require the Commissioner to make the determination concerning the best interests of the child before he institutes contempt proceedings, the amendment itself adds nothing to the pre-emption argument. If the Commissioner finds that instituting contempt proceedings against the mother is not contrary to the best interests of the child, the Congressional concern is satisfied. Furthermore, the child's interests are fully protected, since the initiation of contempt proceedings must, under the regulations, also mean that the mother has been found ineligible for assistance. 45 C.F.R. § 232.12 (1975). This in turn means that the mother has a right to a fair hearing at which the Commissioner's determination can be reviewed. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Cf. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

but an exercise in futility if the putative father should never be identified. The ancillary remedial process afforded by § 52–440b, which is specifically designed to obtain the name of the father, builds upon a legal obligation established by the state; it supplements, but does not alter or supplant, the federal law. Rather than being inconsistent with Part D it may often be the *sine qua non* for any use at all of Part D. There is no reason why the State of Connecticut "might not properly beget a more serious penalty, if the [Connecticut] legislature deemed it wise." *California v. Zook*, 336 U.S. 725, 736, 69 S.Ct. 841, 846, 93 L.Ed. 1005 (1949). Even with the use of § 52–440b there is no guarantee of a successful outcome.

■■■ Applying the foregoing principles, our conclusion is that no sufficient ground appears for denying validity to the Connecticut statute under the doctrine of preemption, once the Commissioner has made the required determination regarding the best interests of the child. The statute does not cover the same ground as the new Part D of the Social Security Act and is not in conflict with it. Because we hold that the state statute is not incompatible, and is therefore not preempted by the federal statute, we must now consider the constitutional questions which the plaintiffs have presented.

## III. The Constitutional Issues

The plaintiffs renew the argument that to subject an unwed mother to the sanctions of the statute must be so contrary to the best interests of her child that § 52–440b cannot be constitutionally applied under any circumstances.

We have previously dealt with the claims of both the mothers and their children that the state statute challenged in this action violates their substantive constitutional rights. In denying those claims, each of the theories advanced by the plaintiffs were discussed at length and no useful purpose would be served by repetition here. We adhere to the conclusions reached in our former opinion.

## IV. Modification of Prior Opinion

■■■ The supremacy of federal law does come into play in this case in one respect. Although § 52–440b can stand unimpaired, the defendant's right to resort to its use must now be conditioned upon his prior compliance with conditions which did not previously exist. The new amendments to the Social Security Act require that the defendant Commissioner may not find an unwed mother who refuses to cooperate in establishing the paternity of her child born out of wedlock ineligible for benefits until he first determines that she does not have good cause for refusing to cooperate, under standards which take into account the best interests of the child.[20] Compliance with these requirements does not jeopardize any legitimate interest in federalism. The defendants are required to comply with such regulations as the Secretary of HEW shall issue (including the right to a fair hearing)

**20.** It has been brought to our attention that because Pub.L. No. 94–88, § 208 (Aug. 9, 1975), requires that proposed regulations implementing the "best interests of the child" policy be presented to Congress for specific approval, HEW has taken the position that the entire amendment will not become effective until the new regulations have been approved. We do not believe that this is the proper construction of the act.

Congress has not merely put the states on notice that it intends to begin worrying about the children's interests at some time in the future. Rather, it has expressed a strong desire that the cooperation requirements of Pub.L. No. 93–647 not be enforced in a manner contrary to the best interests of the very children whom the AFDC program is intended to assist. Congress' interest is so keen that it has further decided to exercise close supervision over the implementing regulations.

Given this status, and comparing the interests of the various states in enforcing the cooperation requirements with the potential damage to the children-beneficiaries of the program if overly harsh enforcement measures are employed against their parents, the wiser course is to require the Commissioner, if he is unable to determine without the aid of specific regulations that his proposed enforcement action is not against the best interests of the child, to postpone any enforcement until the new regulations have been issued and approved.

before continuing with the contempt proceedings against these plaintiffs. This is so even though the proceedings were commenced before the new law was enacted. *Thorpe v. Housing Authority,* 393 U.S. 268, 282, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Until the defendant Commissioner has made the required determinations, continuation by him of the contempt proceedings against the plaintiffs, or removing them from the welfare rolls for their failure to "cooperate," is at the very least inappropriate. *Cf. Diffenderfer v. Central Baptist Church,* 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972).

We therefore order that the defendant shall not remove the plaintiff mothers from the status of eligibility or begin or continue with any pending contempt proceedings against them under § 52–440b until after full compliance with the provisions of Section 402(a)(26) of the Social Security Act as amended. In all other respects, however, the relief requested by the plaintiffs is denied.

SO ORDERED.

NEWMAN, District Judge (concurring in the result):

Since the Court concludes that the Commissioner's failure to make a determination as to whether disclosure of the father's identity is in the best interests of the child is inconsistent with the requirements of the Social Security Act, 42 U.S.C. § 402(a)(26)(B), the Supremacy Clause requires that the Commissioner either forego seeking compulsory disclosure or forego receipt of federal funds. See *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). It is unlikely that the Commissioner will elect to forego federal funds. In any event, he should be given an opportunity to decide whether to bring the state program into conformity with federal statutory requirements before this Court rules on whether compelled disclosure, without the statutorily required determination, encounters constitutional objections. Because I agree with the conclusion that the statutory requirement has not been met, I

concur in the result, without consideration of the constitutional issues. See, generally, Soifer, *Parental Autonomy, Family Rights and the Illegitimate: A Constitutional Commentary,* 7 Conn.L.Rev. 1 (1974).

My view of the limited statutory issue before us also affects the abstention issue. If we were required to decide the constitutionality of the state contempt proceedings, we would encounter the issue of *Younger* abstention, to which the Supreme Court's remand directed our attention. But since the statutory issue suffices for decision of the case at this point, our relief need not enjoin any state proceedings. Technically, according to *Rosado,* our relief should be a declaration and injunction barring the Commissioner from receiving federal funds until his disclosure policy is in compliance with federal statutory requirements. Such an order does not by its terms enjoin any state proceedings, and therefore should not encounter *Younger* objections. If the Commissioner chooses to withdraw his contempt applications in order to assure receipt of federal funds, *Younger* does not stand in the way of a federal court ruling that precipitates such state administrative action.

Since, thus analyzed, the abstention issue does not preclude relief, there is no reason to place any reliance on the supposed lack of capacity of the Connecticut Court of Common Pleas to adjudicate constitutional issues. See *State v. Muolo,* 119 Conn. 323, 176 A. 401 (1935). That decision was announced more than forty years ago in the context of the former town courts, in which judges were not required to be attorneys, and from which most appeals were taken *de novo.* Conn.Gen.Stat. §§ 51–134, 54–12 (1958). Even as to a court of such limited authority, the *Muolo* decision did not preclude it from constitutional adjudication, but simply indicated that it should take such action "only upon the clearest ground or where the rights of the litigants make it imperative that it should do so." 119 Conn. at 326, 176 A. at 403.

It is true that in some instances the Connecticut Circuit Court, which replaced the town courts, viewed *Muolo* as authority for

declining to rule on constitutional issues, see decisions collected in Children's Exhibit B on Remand, and in at least one instance the appellate session of the Superior Court approved this practice. *Helm v. Welfare Commissioner,* 32 Conn.Sup. 595, 600, 348 A.2d 317, 37 Conn.L.J. No. 24, at 12, 14 (1975). Whether that approach of total abdication of responsibility or even the restrictive approach of *Muolo* has continuing validity in the context of the modern Connecticut Court of Common Pleas is a highly questionable proposition. In the first place, *Muolo* itself suggested that unless constitutional adjudication were imperative, it would be better for the former town courts "to leave the decision to our higher courts, to which the matter may be brought by appeal or otherwise." 119 Conn. at 326, 176 A. at 403. Yet the Court of Common Pleas itself was one of the higher courts to which appeals from the town courts were taken. Plainly *Muolo* does not intimate any restriction on the capacity or responsibility of the Court of Common Pleas to adjudicate constitutional issues. And there is no reason to assume that the responsibility of that court has been diminished simply because the jurisdiction of the former Circuit Court has been merged with its own.

Furthermore, serious constitutional issues are posed by the suggestion that a state judge, even of a court of limited jurisdiction, can decline to adjudicate a federal constitutional or statutory question when it arises in a case properly within his jurisdiction. *Cf. Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). *Mondou v. New York, N. H. & H. R. Co.,* 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327 (1912). He has taken an oath to uphold the United States Constitution, and his oath,[1] and the Supremacy Clause,[2] may well obligate him to decide federal constitutional and statutory questions properly before him. It has been

held that even a state constitutional provision limiting the authority of lower state courts to decide constitutional questions cannot displace the Supremacy Clause requirements imposed upon all state judges. *People v. Western Union Tel. Co.,* 70 Colo. 90, 198 P. 146 (1921).

In this litigation, I have previously expressed the view that rather sensitive constitutional adjudication will be required of State Common Pleas judges in the course of considering contempt actions to compel disclosure of the father's identity. 365 F.Supp. at 84. How that adjudication will be affected by the administrative determination now required is also a question that need not be anticipated at this point. But I place no reliance whatever on any limitation of the responsibility of a State Common Pleas judge. It will be time enough to consider that issue when a litigant can demonstrate, in a case properly within our jurisdiction, that she has been injured by the failure of a Common Pleas judge to decide an issue arising under the Constitution or laws of the United States. Until such a case arises, I prefer to think that judges of the Common Pleas Court will seriously accept and discharge the responsibilities imposed upon them by the Supremacy Clause. See *New Haven Tenants' Representative Council, Inc. v. Housing Authority of City of New Haven,* 390 F.Supp. 831 (D.Conn. 1975).

---

1. Conn.Const., Art. XI, § 1 (1965); Conn.Gen. Stat. § 1–25. The oath is itself required by the United States Constitution: ". . . all . . . judicial Officers . . . of the several States, shall be bound by Oath or Affirmation, to support this Constitution. . . ." U.S.Const., Art. VI.

2. "This Constitution, and the laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. . . ." U.S.Const., Art. VI.